UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**BRIELLE J. PLAIR**, as Personal                          Hon.
Representative of the **ESTATE OF
KALIEB L. SOLOMON**, Deceased,

        Plaintiff,

v.

**COUNTY OF MACOMB**, a political
subdivision of the State of Michigan;
**RYAN STEMPNIEWSKI**;
and, **WAYNE RICKERT**;
Jointly and Severally,

        Defendants.
_____/

## COMPLAINT AND JURY DEMAND

      NOW COMES Plaintiff, BRIELLE J. PLAIR, as Personal Representative of

the ESTATE OF KALIEB L. SOLOMON, Deceased, by and through her attorneys,

GARRISON LAW, PC, and TREVOR B. GARRISON and ANLYN ADDIS, and

for her Complaint against the above-named Defendants, hereby states as follows:

## INTRODUCTION

      1.    This is a civil rights/wrongful death action under 42 U.S.C. § 1983

resulting from a systemic indifference to the health and safety of detainees at the

Macomb County jail and the conditions in which they are confined.

      2.    This case arises from a series of suicides at the Macomb County jail.

3.     Plaintiff's decedent, Kalieb L. Solomon ("Kalieb"), took his own life using jail-issued linen.

4.     Jail deputies were told of the suicide in progress but failed to intervene.

5.     Per official reports, on September 12, 2019, at approximately 11:25 pm, three detainees housed in the maximum-security unit heard Kalieb "jumping off of things," "making strange noises," and "gasping for air."

6.     Believing Kalieb was trying to commit suicide, the individuals shook the bars and yelled to get the attention of the deputies supervising the maximum-security unit.

7.     As a result of the noise corrections deputies engaged the intercom system, at which point a detainee asked the deputy to "please send someone down here, I think Solomon hung himself."

8.     Detention personnel ignored the individuals' requests for help and did not respond or perform a welfare check until an hour later, despite notice of an emergency in the housing unit and long after Kalieb's death.

9.     Defendants caused Kalieb's death by failing to respond to his obvious risk of serious injury or death by suicide, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1981 *et seq.* and seeks

monetary damages against Defendants for violations of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the Constitution of the United States. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1367(a), and 42 U.S.C. § 1983.

11.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest and costs.

12.     This Court has personal jurisdiction over the named Defendants because they either reside in the State of Michigan and/or do systematic and continuous business in Michigan.

13.     Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b) because the events that support Plaintiff's allegations occurred in this district and because the Defendants reside in this district.

## **THE PARTIES**

### A.     **Plaintiff**

14.     Plaintiff, BRIELLE J. PLAIR, is the duly appointed Personal Representative of the ESTATE OF KALIEB L. SOLOMON ("Estate") in the Wayne County Probate Court, and was and is a resident of Macomb County in the State of Michigan.

### B.     **Defendant County of Macomb**

15.     Defendant, MACOMB COUNTY, is a political subdivision of the State

of Michigan duly organized to carry out governmental functions under the laws of Michigan, one of the functions being to organize, operate, staff and supervise its detention center known as the Macomb County jail, which houses both pretrial detainees and individuals who have been convicted and sentenced.

### C.   Defendants Ryan Stempniewski and Wayne Rickert, Detention Personnel

16.   Defendant, RYAN STEMPNIEWSKI, was a Sheriff's Deputy employed by Macomb County.  Defendant Stempniewski resided in the State of Michigan and was responsible for providing welfare checks of inmates generally, and to Kalieb specifically. Defendant Stempniewski failed to conduct 60-minute welfare checks of Kalieb's cell on September 12, 2019, and September 13, 2019, and failed to respond to individuals' requests for help during Kalieb's suicide. Defendant Stempniewski was acting under color of state law during the period in question.

17.   Defendant, WAYNE RICKERT, was a Sheriff's Deputy employed by Macomb County.  Defendant Rickert resided in the State of Michigan and was responsible for providing welfare checks of inmates generally, and to Kalieb specifically.  Rickert failed to conduct 60-minute welfare checks of Kalieb's cell on September 12, 2019, and September 13, 2019. Rickert failed to respond to individuals' requests for help during Kalieb's suicide and ignored an inmate who stated, "please send someone down here, I think Solomon hung himself." Defendant

4

Rickert was acting under color of state law during the period in question.

## FACTUAL ALLEGATIONS

### A.    History of Suicides at the Macomb County Jail

18.    Since early 2000 there have been twenty-one suicides at the Macomb County jail. Kalieb Solomon was number 20.

19.    Throughout the years there have been significant suicide clusters. In the year 2001, for example, five individuals committed suicide in less than one year. *Crocker v. County of Macomb,* 119 F. Appx. 718, 721 (6th Cir. 2005).

20.    From December 24, 2004, to February 6, 2014, there were eight suicides at the jail.

21.    In 2014 the Sixth Circuit Court of Appeals took notice of the troubling occurrence of suicide at the facility. Recognizing the need for better training, the Honorable Bernice Bouie Donald asked, "How many times should Macomb County come before this Court before 'the need for better training [becomes] so obvious' that it should be held liable?"  *Grabow v. County of Macomb,* 580 Fed. Appx. 300, 314 (6th Cir. 2014) (Donald, J., concurring); citing *Barber* at 236. Judge Donald further surmised that, "the time may come for this Court to rethink what constitutional protections are available to mentally ill, potentially suicidal inmates and what sort of liability may be imposed on defendants like Macomb County, where these suicides continue to occur at an alarming rate." *Id*.

22.     Following the *Grabow* opinion, seven more people committed suicide at the jail and no efforts were made to increase suicide prevention training.

**B.     History of Inadequate Suicide Prevention Training at the Macomb County Jail**

23.     From at least 2001, Macomb County was aware that dozens of pretrial detainees attempted and completed suicide while housed at the facility, yet Macomb County deliberately failed to provide an appropriate suicide prevention training regimen for detention personnel.

24.     After Kalieb's death, which was the 20th suicide at the facility, the jail's private healthcare contractor performed a mortality review on October 7, 2019.  As a result, the Sheriff's Department was instructed to implement increased training for Sheriff's deputies.

25.     The 21st suicide at the facility occurred just days later on October 19, 2019. Thereafter, a psychological autopsy was performed by the County's private healthcare contractor, who again recommended increased training for corrections officers.

26.     Despite having knowledge of the Court's opinion in *Grabow* and the seven suicides that have occurred since that decision, the former jail administrator offered testimony on September 17, 2020, that no efforts were made by Macomb County to increase suicide prevention training at the jail.

27.     On November 25, 2020, the Macomb County Correctional Training

Sergeant also testified under oath that there is no requirement that jail officials implement, nor that corrections deputies attend, suicide prevention training.

28.     Defendants Stempniewski and Rickert received inadequate suicide prevention training, which improperly taught them to monitor inmates in maximum security housing by relying on closed circuit television.

29.     This suicide prevention practice fails to provide detention personnel with the ability to adequately hear and observe calls for help and inmates experiencing life-threatening emergencies like Kalieb.

30.     Defendants Stempniewski and Rickert did not comply with the minimum requirements for suicide prevention training as set forth in the Sheriff's General Orders.

31.     Macomb County ratified the deficient training Stempniewski and Rickert received.  Neither Defendant was reprimanded for failing to attend suicide prevention training as ostensibly required under the Sheriff's General Orders.

32.     In an effort to contest liability for an inmate death in a suicide case, Defendant Macomb County hired expert suicidologist, Dr. Ronald Maris. On January 15, 2021, Dr. Maris testified that the Sheriff's General Orders on suicide training continued to fall below the recognized standard of care. No efforts were made by the Macomb County Sheriff to amend the General Orders to meet the standard of care that Macomb County's expert recommended.

33.     Pursuant to the terms of a settlement agreement reached on August 5, 2021, Macomb County agreed to implement and track four hours of annual suicide prevention training for correctional officers.

34.     After the settlement was reached, the Sheriff's General Orders were not amended to increase suicide prevention training.

**C.     History of Inadequate Welfare Checks at the Macomb County Jail**

35.     Prior to Kalieb's death, Macomb County officials knew that jail deputies failed to conduct adequate inmate welfare checks throughout the facility.

36.     At all times relevant, Macomb County's written policy for conducting welfare checks did not meet the standard of care and failed to require deputies to document both visual observation and specific inmate activities to ensure their well-being.

37.     In custom and practice, Macomb County's detention personnel fail to visually observe inmate activities to ensure they are alive and breathing.

38.     Individuals have testified in prior cases that welfare checks throughout the facility are "routinely inattentive", and officers fail to stop and address inmate needs while performing rounds.

39.     In custom and practice, detention personnel in maximum security housing rely on a closed-circuit television to monitor inmate-wellbeing.

40.     In custom and practice, Macomb County permits detention personnel

to skip the requisite hourly welfare checks in maximum security housing.

41.     Although Macomb County had a written policy requiring 60-minute welfare checks in the maximum security housing unit "to ensure the security and welfare of each prisoner" as required under General Order 5.07, the policy was not enforced in practice and the lack of enforcement was the moving force behind Kalieb's death.

42.     Defendant detention personnel failed to conduct welfare checks for over seven hours which enabled Kalieb's suicide, yet Defendants Stempniewski and Rickert were not reprimanded, a decision that reveals the County's custom of permitting inadequate welfare checks.

43.     Macomb County ratified the conduct of Stempniewski and Rickert by concluding that these Defendants did not violate the Sheriff's General Orders or any other jail policies or procedures for their failure to check on Kalieb for over seven hours.

44.     Defendant detention personnel's custom and practice of failing to visually observe inmate activities to ensure they are alive and breathing was the moving force behind Kalieb's suicide.

45.     At the time of Kalieb's death, welfare checks were only conducted every 60 minutes.

46.     Defendants were aware that their policies and practices of welfare

checks were deficient as evidenced by dissemination of a memorandum on July 26, 2017, that increased the frequency of welfare checks to every 30 minutes following a cluster of inmate suicides at the jail. Upon implementation of the new policy, no other suicides were completed at the facility.

47.    However, immediately after returning to a policy of conducting rounds every 60 minutes, three inmate suicide deaths occurred at the jail, including Kalieb's.

### D.    History of Inadequate Emergency Response at the Macomb County Jail

48.    From the turn of the century, the Macomb County Sheriff's Department has had a policy and practice of willfully failing to respond to medical emergencies for individuals detained in the jail.  For example:

    a.  During T.C.'s suicide, the decedent's cellmate pressed the emergency button in the housing unit to get help but received no response from jail deputies.

    b.  The roommate of D.H. testified that corrections deputies repeatedly ignored the decedent's requests for help through the emergency intercom prior to his death, and routinely ignored others who engaged the emergency response button, stating "when you press the button, they do not answer, or they reply with, 'You press the button again, we will lock you down. They don't want to be bothered with the buttons.'"

    c.  Another person at the jail averred through affidavit, "Officers would rarely respond to our requests for help when we used the intercom system. On the rare occasion when officers did respond, they would say things like, 'quit hitting the button.' They would tell us that if we continued to push the button, they would not give us our recreation time or they would lock us down.'"

49.     There was no emergency alert system available to request help in the maximum-security unit, so individuals housed there had to yell to get the attention of corrections deputies during incidents of suicide and attempted suicide.

50.     Macomb County had a policy and practice of maintaining an inadequate emergency notification system that prevented inmates from notifying jail deputies of life-threatening emergencies in  maximum security housing.

### E.     Kalieb's Mental Health History

51.     Defendants Macomb County and its detention personnel failed to properly evaluate Kalieb's mental health history from the time of his entry to the jail in concluding he did not have any mental health issues that would prohibit his placement in isolation.

52.     In 2008 Kalieb entered the Michigan Department of Corrections at 16-years-old, where he was diagnosed with adjustment disorder with mixed emotions, antisocial personality disorder, and recommended counseling for anxiety.

53.     Michigan Department of Corrections records indicate Kalieb had a substance abuse history beginning at age 15 and was also placed on anti-psychotic medication for a period of time.

54.     Despite this documented correctional mental health history Kalieb was not referred for any further mental health evaluation or treatment upon entry to the Macomb County jail.

55.    Detention personnel were aware that on November 15, 2018, Kalieb was transported to the Forensic Center for evaluation of Competency to Stand Trial and Criminal Responsibility.

56.    It was noted in the Forensic Center examiner's report that during his evaluation Kalieb was not oriented to date and time and believed it was October 14, 2018.

57.    During his competency evaluation Kalieb told the examiner that he had expressed suicidal ideations on multiple occasions to correctional staff during his time in prison.

58.    On May 6, 2019, an arraignment conference before Judge Viviano was adjourned because Kalieb had to be removed from the courtroom and refused to participate in court proceedings.

59.    On May 7, 2019, Kalieb declined the assistance of counsel during his criminal proceedings and insisted on representing himself.

60.    On August 5, 2019, Kalieb filed a federal civil lawsuit without counsel and alleged, in part, that he was "mentally deluded," had become "psychologically crippled," and had "yet to receive any mental therapy" during his incarceration.

61.    Despite having received notice of the lawsuit, Defendant Macomb County failed to respond.

62.    Defendant detention personnel were on notice of Kalieb's inability to

cope with the conditions of confinement as evidenced by a misconduct citation he was issued for being in possession of a towel torn into a ligature, an attempt to remove a block from his cell in an effort to escape, and a note which documented his plan to commit suicide if he was not acquitted.

### F.    Kalieb's Mental Health Emergency

63.    On September 12, 2019, at approximately 4:00 pm Kalieb returned from Court after being found guilty by a jury and was housed in a maximum security cell.

64.    At 6:34 pm, Kalieb paced back and forth in a hallway for approximately two hours. No welfare checks were performed by jail personnel during this time.

65.    The next welfare check by jail personnel did not occur until approximately 11:20 pm, when Defendant Stempniewski entered the unit. Defendant Stempniewski exited the unit less than ten seconds later without stopping to speak to any of the inmates, including Kalieb, to assess their wellbeing.

66.    After Defendant Stempniewski's round, other inmates heard Kalieb "gasping for air," making "strange noises like someone trying to catch their breath," and clamoring in his cell.

67.    There is no emergency button in maximum security housing and officers do not conduct rounds as required by law, so yelling for help is the only available mechanism for inmates to notify deputies of medical emergencies in the

unit.

68.     Several individuals housed within earshot of Kalieb notified Defendants Stempniewski and Rickert of the emergency in progress by yelling and striking the steel bars inside their cells.

69.     Defendants Stempniewski and/or Rickert responded by activating the intercom system to communicate with the inmates and inquire about the noise. The inmates responded and informed Defendants Stempniewski and Rickert of the suicide in progress while listening to Kalieb gasp for air.

70.     The individual housed in cell number one specifically informed Defendant detention personnel that Kalieb was committing suicide.

71.     After learning that Kalieb was committing suicide, Defendants Stempniewski and Rickert failed to perform a welfare check or render any aid. Both Defendants Stempniewski and Rickert were deliberately indifferent to whether Kalieb was committing suicide.

72.     Defendants Stempniewski and Rickert ignored the inmates' requests for medical attention thereby enabling and permitting Kalieb to die in his cell.

73.     Finally, at 12:16 am, almost one hour after the inmates first informed detention personnel of the suicide in progress, Defendant Rickert entered the unit to perform a welfare check.

74.     While inside the unit, the inmates again informed Defendant Rickert to

14

check on Kalieb. Even then, Defendant Rickert did not offer to help Kalieb until two minutes later, at 12:18 am, at which point Kalieb was already deceased.

### G.    Ratification of Detention Personnel Misconduct

75.    Defendant Macomb County, by and through the Macomb County Sheriff's Department, has an internal affairs division called the Office of Professional Standards (hereinafter "internal affairs").  After an in-custody death or critical incident occurs, internal affairs is tasked with investigating whether any action or inaction by detention personnel violated the Sheriff's General Orders. The investigative findings are then reduced to a summary and distributed to shift command, jail administration, and relevant policymakers.

76.    Defendant Macomb County has a long history of ratifying the misconduct of corrections personnel and failing to correct obvious policy violations by detention personnel after suicides occur.

77.    Internal affairs investigations demonstrate Macomb County's policy and custom of deliberate indifference to the needs of suicidal individuals considering numerous similar critical incidents whereby detention personnel were not disciplined despite committing obvious policy violations.  For example:

> a.    Following S.T.'s suicide in April of 2002, jail commanders retrieved relevant video footage of security rounds and reports generated from the Watch Tour System (a program that purportedly documented the timing of security rounds) as part of their investigation. Policymakers did not discipline detention personnel despite a documented deficiency in security rounds,

and instead blamed a malfunction in the Watch Tour System to clear officers of any wrongdoing.

b.    C.D. died by suicide in August of 2010. Internal affairs investigators documented the timing of security rounds to exceed one hour. Notwithstanding detention personnel's clear violation of the Sheriff's General Orders (which required irregular 60-minute rounds), Macomb County failed to discipline detention personnel and cleared officers of any wrongdoing.

c.    J.M. died in July of 2013 as the result of an infection that slowly consumed her body over a 12-day period. Macomb County officials learned through post-death interviews that J.M. repeatedly requested medical attention but her pleas for help were ignored. Macomb County failed to discipline detention personnel and cleared officers of any wrongdoing.

d.    In June of 2014, D.S. passed away from acute drug withdrawal. Macomb County officials obtained security video and learned that while D.S. was housed in a mental health cell his condition visibly deteriorated over several days.  Despite his obvious need for help, correctional personnel failed to procure appropriate emergency medical services needed to save his life. Macomb County failed to discipline detention personnel and cleared officers of any wrongdoing.

e.    C.A. died by suicide in May of 2017. Upon intake, no inquiry was made whether she verbalized thoughts of suicide to arresting officers. Per policy, C.A. should not have been accepted into the jail where this risk factor was not recorded on her Jail Detention Card.  This deficiency was documented by internal affairs, yet Macomb County officials failed to discipline detention personnel and cleared officers of any wrongdoing.

f.    D.H. died by suicide in July of 2017. Video footage established the security round immediately preceding his death lasted just 14 seconds.  Despite the obvious deficiency in performing security rounds, Macomb County failed to discipline detention personnel and cleared officers of any wrongdoing.

g.     Despite recorded interviews of individuals housed with D.H. that described his obvious signs of suicidality prior to his death, Macomb County omitted these observations from official documentation. Yet detention personnel were not disciplined and cleared of any wrongdoing.

78.     Leading up to Kalieb's suicide on September 13, 2019, video footage established that security rounds were not performed by Defendants Stempniewski and Rickert for over seven hours. Despite the obvious deficiency in performing security rounds, Macomb County failed to discipline these Defendants and cleared them of any wrongdoing.

79.     Defendant Macomb County's repeated ratification of officer misconduct, including but not limited to that of Defendants Stempniewski and Rickert, establishes the existence of a policy of acquiescence that in itself was the moving force behind Kalieb's death.

## FEDERAL CLAIMS

## COUNT I

### Cruel and Unusual Punishment

**Against Macomb County, Stempniewski, and Rickert,
In Violation of the Eighth Amendment,
Cognizable Under 42 U.S.C. § 1983**

80.     Plaintiff hereby restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

81.     At all times relevant, all Defendants identified herein were acting

within the course and scope of their employment with the County of Macomb and were acting under color of state law with the authority granted to them as detention personnel.

82.    At all times relevant, it was clearly established that detainees, including Kalieb, had the right to be safe and free from the unreasonable risk of harm and death.

83.    The Defendants had at least the following duties:

a.    To see that measures were in place to reasonably ensure inmates' and detainees' safety, including the safety of Kalieb;

b.    To attend to such measures and reasonably ensure inmates' and detainees' safety, including the safety of Kalieb;

c.    To see that measures were in place to reasonably ensure that inmates and pretrial detainees had sufficient access to the mental health unit to maintain their health, or to take steps to compel such maintenance when it was appropriate, such as in this case;

d.    To attend to such measures and reasonably ensure that inmates and pretrial detainees were alive and well and maintaining their mental health, or to take steps to compel such maintenance when it was appropriate, such as in this case;

e.    To ensure that inmates and detainees, including Kalieb, were provided a level of healthcare that a civilized society would think necessary;

f.    To ensure that steps were taken to prevent inmates from committing suicide;

g.    To provide reasonably safe conditions of confinement including, but not limited to, a functioning emergency alert system for inmates in maximum security to prevent repeated suicides from

18

occurring;

h.  To ensure that timely and sufficient welfare checks were completed to ensure that inmates, including Kalieb, were safe and properly cared for.

84.  Defendants breached these duties and were deliberately indifferent to

Kalieb's needs in at least the following particulars:

a.  Allowing Kalieb to commit suicide while in custody;

b.  Failing to have policies and procedures in place, and/or by failing to adequately supervise or train employees in accordance with said policies and procedures, and/or by failing to attend to such policies and procedures so as to ensure the medical safety of jail inmates such as Kalieb;

c.  Failing to have policies and procedures in place, and/or by failing to adequately supervise or train its employees in accordance with said policies, and/or by failing to attend to such policies and procedures intended to ensure that jail inmates, such as Kalieb, were provided a level of care that a civilized society would think necessary;

d.  Failing to have policies and procedures in place, and/or by failing to adequately supervise or train its employees in accordance with said policies, and/or by failing to attend to such policies and procedures intended to ensure the reasonable safety and health of inmates and detainees with mental health issues and/or suicidal tendencies, such as those exhibited by Kalieb;

e.  Failing to have policies and procedures in place, and/or by failing to adequately supervise or train its employees in accordance with said policies, and/or by failing to attend to such policies and procedures intended to monitor inmates and detainees who were at risk of suicide;

f.  Failing to have policies and procedures in place, and/or by

failing to adequately supervise or train its employees in accordance with said policies, and/or by failing to attend to such policies and procedures intended to ensure that welfare checks were being performed;

g. Failing to provide reasonably safe conditions of confinement including, but not limited to, installing and maintaining an adequate emergency alert system for inmates in maximum security; and,

h. Failing to intervene and prevent Kalieb's death.

85.   The Defendants were repeatedly deliberately indifferent to Kalieb's serious medical needs, and/or the policies and procedures developed and administered by said Defendants were deficient and deliberately indifferent to the foreseeable circumstances, such as detainees who develop serious mental health needs, as was the case here.

86.   Since the year 2000, Defendant Macomb County has had a practice of encouraging internal affairs officers to falsify and/or omit facts in their death investigation reports to conceal evidence of correctional personnel wrongdoing.

87.   This practice prevents jail administration from developing policies, practices, and disciplinary action necessary to prevent future injuries from occurring and evinces deliberate indifference to the risk of inmate serious injury or death.

88.   As a direct and proximate result of Defendants' deliberate indifference, Kalieb committed suicide while in custody.

89.   Kalieb was forced to endure prolonged pain and suffering leading up to

the time of his death, as other inmates specifically requested help from jail deputies during the incident and his condition could have been stabilized.

90.    On September 13, 2019, at approximately 11:25 pm, Defendants Stempniewski and Rickert were aware there was a strong likelihood of suicide where individuals housed with Kalieb in maximum security alerted them to his suicide in progress and requested these Defendants render aid.

91.    Both Defendants Stempniewski and Rickert were aware that Kalieb was attempting to commit suicide.  Despite this knowledge, both Stempniewski and Rickert deliberately disregarded or responded unreasonably to Kalieb's serious medical emergency.

92.    Defendants were aware of Kalieb's inability to cope with the conditions of confinement and resulting suicidality as evidenced by a misconduct citation he was issued for being in possession of a towel torn into a ligature, an attempt to remove a block from his cell in an effort to escape, and a note which documented his plan to commit suicide if he was not acquitted.

93.    As a direct and proximate result of the Defendants' deliberate indifference, Plaintiff has sustained and is entitled to compensation for conscious pain and suffering of the Deceased, funeral, burial, and economic costs and/or damages, loss of support, loss of gifts and gratuities, and loss of love, society, and companionship.

94.     By the aforementioned acts of deliberate indifference, the Defendants deprived Kalieb of the rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

95.     The Defendants' conduct was and remains extreme and outrageous subjecting Defendants to punitive damages.

96.     Plaintiff and Plaintiff's Estate are obligated to the undersigned attorneys for payment of attorney fees and costs and seek recovery of reasonable attorney fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff requests the following relief:

   a.    Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan including, but not limited to, the Michigan Wrongful Death Act;

   b.    Punitive damages;

   c.    Reasonable attorney fees, costs, and interest; and,

   d.    Such other and further relief as appears reasonable and just under the circumstances.

## COUNT II

### Cruel and Unusual Punishment – *Kingsley* standard

**Against Macomb County, Stempniewski, and Rickert,
In Violation of the Fourteenth Amendment,
Cognizable Under 42 U.S.C. § 1983**

97.     Plaintiff hereby restates and realleges the allegations contained in the

above paragraphs as though fully set forth herein.

98.   At all times relevant, all Defendants identified herein were acting within the course and scope of their employment with the County of Macomb and under color of state law with the authority granted to them as corrections officers.

99.   At all times relevant, it was clearly established that jail inmates, including Kalieb, had the right to be safe and free from the unreasonable risk of harm and death.

100.   In *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015), the Supreme Court held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component by showing that "the force purposely or knowingly used against him was objectively unreasonable." *Id*. at 2473.   Moreover, "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* At 2473-74.

101.   The Sixth Circuit has recognized *Kingsley's* shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether a plaintiff need even show that the individual defendant-officials were subjectively aware of serious medical conditions and nonetheless wantonly disregarded them. *Richmond v. Huq*, 885 F.3d 928, n. 3 (6th Cir. 2018).   *See* also, *Darnell v. Pineiro*,

849 F.3d 17, 34–35 (2d Cir. 2017) (holding that the "subjective prong" of a claim of deliberate indifference to conditions of confinement under the Fourteenth Amendment must be "defined objectively" in light of *Kingsley*); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), *cert. denied sub nom*. *Los Angeles Cty. v. Castro*, — U.S. — , 137 S. Ct. 831 (2017) (interpreting *Kingsley* to mean that a failure-to-protect claim brought by a pretrial detainee under the Fourteenth Amendment does not include a subjective intent element).

102.   In the Sixth Circuit, the question remains open whether *Kingsley* applies beyond excessive force claims to medical treatment claims raised by pretrial detainees.  *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482, n.8 (6th Cir. 2020).

103.   At the time of his death Kalieb was a detainee at the jail, had not been sentenced, and the Court had not yet imposed punishment.  Thus, there is no need here, as there might be for a prisoner, to determine when punishment is unconstitutional.

104.   Kalieb's Fourteenth Amendment claim need only meet the objective component by showing that his needs were "sufficiently serious."   *Farmer v. Brennan,* 511 U.S 825, 834 (1994).  An "official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  *Id.*

105.   Kalieb's needs were "objectively serious" if they were "diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.,* 390 F.3d 890, 897 (6th Cir. 2004).

106.    Defendants were aware of Kalieb's inability to cope with the conditions of confinement and resulting suicidality as evidenced by a misconduct citation he was issued for being in possession of a towel torn into a ligature, an attempt to remove a block from his cell in an effort to escape, and a note which documented his plan to commit suicide if he was not acquitted.

107.    Macomb County detention personnel failed to speak to Kalieb, much less monitor him, after he was placed in maximum security housing, despite his documented correctional mental health history, their knowledge that Kalieb elected to represent himself at trial, his referral to the Forensic Center for Evaluation of Competency to Stand Trial and Criminal Responsibility, his history of substance abuse, the fact that the individuals housed with him recognized he was experiencing a mental health emergency, and his demonstrated mental health needs.

108.    Defendants Stempniewski and Rickert were aware that during his evaluation at the Forensic Center Kalieb reported a history of cannabis and cocaine addiction and that his MDOC records document a history of taking psychotropic medication, yet they failed to provide Kalieb with any medical or mental health treatment and instead placed him in maximum security housing.

109.  On September 13, 2019, at approximately 11:25 pm, Defendants Stempniewski and Rickert were informed of and aware that Kalieb's suicide was in progress and failed to intervene.

110.  The treatment Kalieb received by detention personnel Stempniewski and Rickert after he was placed in maximum security housing was constitutionally impermissible because it was "so woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976).

111.  Defendants Macomb County, Stempniewski, and Rickert knew correctional personnel relied on closed circuit television to monitor individuals in maximum security housing.  Had direct and/or meaningful welfare checks been performed, a different outcome with respect to Kalieb's medical care and housing supervision would have resulted.

112.  Defendants Macomb County, Stempniewski, and Rickert knew that in the year preceding Kalieb's death, numerous individuals attempted and completed suicide at the Macomb County Jail.

113.  Despite possessing the authority and means to remedy Kalieb's unconstitutional treatment, Defendants were deliberately indifferent to said treatment and knowingly and recklessly failed to take immediate action which would have ensured Kalieb's safety and prevented his injuries and death.

114.  At all times relevant, Macomb County and the afore-referenced

individual Defendants' unconstitutional and deliberately indifferent actions, individually and/or collectively, contributed to or caused the unnecessary and wanton pain and suffering to Kalieb and are detailed as follows:

a.   Defendants Stempniewski and Rickert failed to conduct welfare checks of Kalieb and other inmates housed in maximum security;

b.   Defendants Macomb County implemented a policy, practice, or custom of relying on untrained and unqualified inmates to recognize and prevent emergencies and to disclose and communicate those emergencies to detention personnel in a timely fashion;

c.   Defendants Macomb County, Stempniewski and Rickert implemented a policy, practice, or custom of failing to conduct welfare checks in maximum security housing, thereby encouraging inmates to engage in dangerous behavior while alone in their cells;

d.   Defendant Macomb County implemented a policy, practice, or custom of failing to train staff to prevent suicides from repeatedly occurring;

e.   Defendants Stempniewski and Rickert failed to respond to a known substantial risk of harm to Kalieb, the knowledge of said risk of harm being obvious to numerous witnesses housed in the maximum security unit with Kalieb;

f.   Defendant Macomb County implemented a policy, practice or custom of failing to refer inmates with known mental health needs, including Kalieb, to Qualified Mental Health Professionals for proper suicide risk assessments;

g.   Defendant Macomb County failed to implement policies to ensure correctional personnel obtained medical histories of inmates or reviewed medical records already in the possession of jail personnel before making housing recommendations;

h.      Defendant Macomb County implemented unconstitutional policies and ratified employees' unconstitutional actions without disciplinary changes or making any measurable and meaningful changes in policies and practices that resulted in Kalieb's suicide;

i.      Defendant Macomb County implemented a custom and practice of tolerating indirect welfare checks, non-visual welfare checks, insufficient welfare checks, infrequent welfare checks, or non-existent welfare checks of inmates;

j.      Defendant Macomb County had a custom and practice of tolerating inhumane conditions of confinement by repeatedly allowing individuals to attempt and commit suicide, and/or intentionally permitting dangerous conditions of confinement to exist;

k.      Defendants Macomb County had a custom and practice of not requiring arresting officers to complete Jail Detention Cards, contrary to the written instructions on the Jail Detention Cards, thereby ensuring that individuals were repeatedly accepted into the detention facility without first inquiring about their mental health history or suicidality;

l.      Defendants failed to accurately investigate Kalieb's history of taking psychotropic medication and falsely reported that Kalieb did not have a history of mental health issues;

115. As a direct and proximate result of the Defendants' deliberate indifference, as defined under *Kingsley*, Plaintiff has sustained and is entitled to compensation for conscious pain and suffering of the Deceased, funeral, burial, and economic costs and/or damages, loss of support, loss of gifts and gratuities and loss of love, society and companionship.

116. By the aforementioned acts of deliberate indifference, as interpreted

under *Kingsley,* the Defendants deprived Kalieb of the rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

117.   The Defendants' conduct was and remains extreme and outrageous subjecting Defendants to punitive damages.

118.   Plaintiff and Plaintiff's Estate are obligated to the undersigned attorneys for payment of attorney fees and costs and seek recovery of reasonable attorney fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff requests the following relief:

  a.   Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan including, but not limited to, the Michigan Wrongful Death Act;

  b.   Punitive damages;

  c.   Reasonable attorney fees, costs, and interest; and,

  d.   Such other and further relief as appears reasonable and just under the circumstances.

## COUNT III

### Failure to Train

**Against Macomb County**
**In Violation of the Eighth and/or Fourteenth**
**Amendments, Cognizable Under 42 U.S.C. § 1983**

119. The allegations contained in the above paragraphs are hereby incorporated by reference.

120. Defendant Macomb County is considered a "person" under 42 U.S.C. § 1983, and thus may be liable for causing a constitutional deprivation.

121. "[A county] may also be liable under 42 U.S.C. § 1983 in certain circumstances for constitutional violations arising from its failure to properly train its employees." *Barber v. City of Salem,* 953 F.2d 232 (6th Cir. 1992), relying on *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989).

122. Plaintiff "must show that inadequate training represented [Defendants'] policy and that the need for better training was so obvious and the inadequacy so likely to result in a violation of constitutional rights, that [Defendants] can be said to have been deliberately indifferent to the need." *Barber* at 236.

123. However, "[w]here a § 1983 plaintiff can establish that the facts available to [county] policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton, supra* at 396.

124. At all times relevant, Macomb County foresaw, or should have foreseen, or was placed on actual or constructive notice of, the fact that detainees, including Kalieb, were being taken into custody who may suffer from mental health

conditions or suicidal tendencies who were not being sufficiently monitored by detention personnel.

125.   Macomb County failed to provide adequate training to its employees to reasonably provide for the safety and health of inmates and detainees with such mental health conditions or self-destructive or suicidal tendencies by failing to increase the frequency of welfare checks to every 30 minutes after a suicide cluster in the facility; by failing to provide Stempniewski and Rickert with sufficient suicide prevention training; and by encouraging Stempniewski and Rickert to rely on closed circuit television to monitor detainees in maximum security housing without the need to perform in-person security rounds.

126.   The failure of Macomb County to implement different or additional training to Defendants Stempniewski and Rickert was so obvious that its failure to do so is properly characterized as deliberate indifference to Kalieb's Constitutional rights.

127.   The facts available to Macomb County policymakers that put them on actual or constructive notice that their acts and omissions were substantially certain to result in the violation of the constitutional rights of the inhabitants of the Macomb County jail are detailed as follows:

a.   The failure to train deputies and corrections officers was the moving force of Kalieb's death where, after his suicide, jail command officers recognized that "more communication" and better "training for court deputies" was required;

b.  Following the *Grabow* opinion in the year 2014 which was critical of Macomb County's training regimen, seven more people committed suicide at the jail and no efforts were made to increase suicide prevention training;

c.  After the 21st suicide at the facility, Macomb County's private healthcare contractor again recommended increased training for corrections officers;

d.  A training sergeant testified in a prior case that there is no requirement that jail officials implement, nor that corrections deputies attend, suicide prevention training;

e.  Macomb County's Sheriff's Orders do not meet the standard of care because they do not require deputies to document both visual observation and specific inmate activities to ensure their well-being.

128.  The failure of Macomb County to provide Defendant detention personnel with adequate training and supervision is shown through its "pattern of similar constitutional violations by untrained employees" and Macomb County's "continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by employees," thus establishing "the conscious disregard for the consequences of [its] action." *Shadrick v. Hopkins Cty., Ky.,* 805 F.3d 724, 739 (6th Cir. 2015).

129.  The pattern that has emerged since the year 2000 is that Macomb County:

a.  Repeatedly implements cost containment efforts by sacrificing the quality of mental health care;

b.  Repeatedly provides minimal training over classification and

32

housing decisions;

c.  Repeatedly fails to implement individualized treatment plans, including psychiatric medication management and discharge plans;

d.  Repeatedly fails to provide or recommend psychotherapy or intensive therapeutic interventions;

e.  Repeatedly understaffs facilities;

f.  Repeatedly fails to provide adequate intake and emergency care such that inmates are subjected to an unacceptable risk of harm due to delays or lack of treatment;

g.  Repeatedly fails to screen inmates for mental illness;

h.  Repeatedly fails to treat and supervise suicidal individuals;

i.  Repeatedly fails to maintain complete and accurate medical records;

j.  Repeatedly relies on the self-report of mental health issues by inmates and/or other inmates housed together;

k.  Repeatedly places inmates with serious mental illness in housing conditions which result in the denial of access to adequate medical and mental health care and/or exposes them to a substantial risk of serious harm and/or inhumane conditions of confinement; and,

130.  Alternatively, Macomb County failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.

131.  Macomb County failed to provide adequate policies, procedures, or training to their employees or contractors in instructing and directing them to adequately monitor and respond to inmates with severe mental health problems that subsequently lead to serious and manifestly life-threatening medical conditions.

Macomb County was deliberately indifferent to the health and safety of Kalieb, which deliberate indifference caused his death.

132.    As a direct and proximate result of Macomb County's deliberate indifference, Plaintiff has sustained and is entitled to compensation for conscious pain and suffering of the Deceased, funeral, burial, and economic costs and/or damages, loss of support, loss of gifts and gratuities, and loss of love, society, and companionship.

133.    By the aforementioned acts of deliberate indifference, Macomb County deprived Kalieb of the rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

134.    The Defendant's conduct was and remains extreme and outrageous subjecting it to punitive damages.

135.    Plaintiff and Plaintiff's Estate are obligated to the undersigned attorneys for payment of attorney fees and costs and seek recovery of reasonable attorney fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff requests the following relief:

   a.    Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan including, but not limited to, the Michigan Wrongful Death Act;

   b.    Punitive damages;

    c.      Reasonable attorney fees, costs, and interest; and,

    d.      Such other and further relief as appears reasonable and just under the circumstances.

## COUNT IV

### Unlawful Custom, Policy or Practice – Laxity

**Against Macomb County
In Violation of the Eighth and/or Fourteenth
Amendments, Cognizable Under 42 U.S.C. § 1983**

136.   The allegations contained in the above paragraphs are hereby incorporated by reference.

137.   Macomb County's actions occurred under the color and pretense of Michigan law, and in Defendants' official and individual capacities.

138.   If a governmental agency or agent thereof has a policy, custom, or practice that tolerates commission of unconstitutional acts by its officers and/or employees, then the agency and/or the employees or contractors who are in a position to set the policy, custom, or practice may be held liable directly for the consequences of any unconstitutional acts by said persons.

139.   For years, Defendant Macomb County tolerated non-visual welfare checks of inmates housed in maximum security and other areas of the jail, which enabled inmates to attempt and commit suicide.

140.   Macomb County's practice of allowing corrections personnel to monitor inmates using closed circuit television, failure to conduct welfare checks

with direct visual observation of inmate activities, and refusal to respond to requests for help with serious medical emergencies constituted and/or evidenced a custom of laxity regarding the supervision and monitoring of the health and safety of inmates, pretrial detainees, and the jail premises, which custom was or became a *de facto* official policy.

141.   Macomb County's allowing such a policy, custom, or practice to develop and exist constituted deliberate indifference to Kalieb's rights, health, and safety and was the moving force of his death.

142.   As a direct and proximate result of this custom of laxity, Kalieb suffered and was deprived of his life without due process of law, as applied through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

143.   As a direct and proximate result of the Defendant Macomb County's deliberate indifference, Plaintiff has sustained and is entitled to compensation for conscious pain and suffering of the Deceased, funeral, burial, and economic costs and/or damages, loss of support, loss of gifts and gratuities, and loss of love, society, and companionship.

144.   Defendant Macomb County's conduct was and remains extreme and outrageous subjecting it to punitive damages.

145.   Plaintiff and Plaintiff's Estate are obligated to the undersigned

attorneys for payment of attorney fees and costs and seek recovery of reasonable attorney fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff requests the following relief:

a. Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan including, but not limited to, the Michigan Wrongful Death Act;

b. Punitive damages;

c. Reasonable attorney fees, costs, and interest; and,

d. Such other and further relief as appears reasonable and just under the circumstances.

## STATE LAW CLAIM

## COUNT V

### Gross Negligence

**Against Stempniewski and Rickert**

146. The allegations contained in the above paragraphs are hereby incorporated by reference.

147. At all relevant times, Defendants Stempniewski and Rickert were acting within the course and scope of their employment with Defendants Macomb County as correctional officers.

148.   These Defendants owed Kalieb the duty to provide reasonably safe housing and protection, to provide reasonably safe conditions of confinement.

149.   Defendants Stempniewski and Rickert breached these duties and were grossly negligent as that term is defined in MCL § 691.1407, when they acted intentionally by the actions described above, said acts having been committed intentionally or so recklessly as to demonstrate a substantial lack of concern as to whether injury would result and/or their acts of willful and wanton misconduct toward Kalieb and in disregard for his health and safety.

150.   At all relevant times, these Defendants were grossly negligent in one or more of the following ways:

    a.   Failing to conduct welfare checks every 60 minutes at irregular intervals under General Order 5.07, thereby enabling Kalieb to commit suicide;

    b.   Relying on closed circuit television to monitor Kalieb's well being, knowing that jail structure prevented them from actually observing Kalieb in his cell;

    c.   Failing to provide Kalieb with appropriate and reasonable medical and/or mental health treatment despite being informed that such treatment was required;

    d.   Intentionally denying or delaying Kalieb access to appropriate medical care;

    e.   Acting with gross negligence or deliberate indifference toward, or willful disregard of, any violation of Kalieb's constitutional rights; and,

    f.   Other breaches that become known during the course of discovery.

151.    As the direct and proximate result of the above cited violations of Kalieb's care and supervision, Kalieb died and his Estate has and will continue to suffer damages in the future, including, but not limited to:

    a.    Reasonable medical, hospital, funeral, and burial expenses;

    b.    Reasonable compensation for the pain and suffering undergone by Kalieb while he was conscious during the time between his first psychiatric symptoms and his death;

    c.    Loss of financial support;

    d.    Loss of service;

    e.    Loss of gifts or other valuable gratuities;

    f.    Loss of parental training and guidance;

    g.    Loss of expected inheritance;

    h.    Loss of society and companionship; and,

    i.    Any and all other damages identified through the course of discovery otherwise available under the Michigan Wrongful Death Act, MCL § 600.2922.

WHEREFORE, Plaintiff requests the following relief:

    a.    Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the laws of the State of Michigan including, but not limited to, the Michigan Wrongful Death Act;

    b.    Reasonable attorney fees, costs, and interest; and,

    c.    Such other and further relief as appears reasonable and just under the circumstances.

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, by and through her counsel and hereby demands a trial by jury as to all those issues so triable as of right.

Respectfully submitted,

**GARRISON LAW, PC**

Dated:  September 27, 2021

/s/ *Trevor B. Garrison*
TREVOR B. GARRISON (P69255)
ANLYN ADDIS (P76568)
Attorneys for Plaintiff
1523 N. Main St.
Royal Oak, MI 48067
(248) 847-1000