## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRIELLE J. PLAIR, as Personal
Representative of the ESTATE of
KALIEB L. SOLOMON, Deceased,

              Plaintiff,

   v.

COUNTY OF MACOMB, a political
subdivision of the State of Michigan,
and TIMOTHY RICKERT,

              Defendants.

_____/

Case No. 21-cv-12275

Paul D. Borman
United States District Judge

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 27)

## I. INTRODUCTION

This case arises out of the tragic death of Kalieb Solomon, who committed suicide in Macomb County Jail on September 12, 2019.

After Solomon's death, Brielle Plair, as personal representative of Solomon's estate, sued Officer Timothy Rickert and Macomb County. Plair claims that Rickert is liable for acting with deliberate indifference to Solomon's serious medical needs, in violation of the Eighth and/or Fourteenth Amendments, and for negligently discharging his duty to care for Solomon, in violation of Michigan common law. Plair also claims that Macomb is liable for promulgating affirmative policies that

were inadequate to protect those incarcerated from suicide risks, failing to properly train its officers, and acquiescing to a custom of officers not responding to requests for medical attention, all in violation of the Eighth and/or Fourteenth Amendments.

Both Rickert and Macomb have moved for summary judgment. For the reasons that follow, the Court will **GRANT** their Motion on all of Plair's claims *except* for her claim that Rickert violated Solomon's Fourteenth Amendment right to be free from deliberate indifference to his serious medical needs.

## II. STATEMENT OF FACTS

**In 2002, after a string of suicides, the Macomb County Jail commissions a report on suicide prevention practices.**

In the three years preceding April of 2002, seven people incarcerated in the Macomb County Jail ("MCJ") committed suicide. (ECF No. 32-20, PageID 1310.) In response, MCJ Administrator Michelle Sanborn and Mark Hackel, of the Macomb County Sheriff's Office ("MCSO"), hired Assistant Director of the National Center on Institutions and Alternatives Lindsay Hayes to "determin[e] what steps, if any, were necessary to improve suicide prevention practices at [MCJ]." (ECF No. 32-20, PageID 1310.)

Hayes visited MCJ for two days, "met with and/or interviewed numerous correctional, medical and mental health staff," reviewed "numerous documents," and reviewed the "case files of the [seven] recent inmate suicides." (ECF No. 32-20, PageID 1313.) The Report that he submitted in June of 2002 "noted that the MCSO

ha[d] a good suicide prevention program, and [that] its health care services [were] accredited by the National Commission on Correctional Health Care." (ECF No. 32-20, PageID 1343.) But it also recommended some improvements.

MCJ appears to have implemented some of these recommendations. For example, at least recently, MCJ has ensured that "mental health evaluations [are] completed (separately from the intake mental health screening and assessment) by mental health staff within 14 days of an inmate's admission into the MCSO jail system" and has carried out "a formalized mortality review process [that] follow[s] an inmate suicide." (ECF No. 27-5; ECF No. 32-5; ECF No. 32-14; ECF No. 32-20, PageID 1326, 1342.) It has also placed "suicidal inmates" on either "constant observation" or "close observation," in which officers round "at staggered intervals not to exceed every 15 minutes." (ECF No. 27-14, PageID 316; ECF No. 32-20, PageID 1335.)

MCJ has not, or not consistently, implemented other of the Report's recommendations. For example, MCJ still does not arrange for "medical or mental health[] personnel [to] conduct regularly scheduled (at least three times weekly) welfare checks of <u>all</u> inmates in 'special housing units' (e.g., booking/holding, pre-classification, medical disciplinary/administrative segregation, etc.)." (ECF No. 32-20, PageID 1337; ECF No. 32-21, PageID 1413.) MCJ has also gone back and forth between requiring "correctional staff . . . to physically observe inmates placed in

'special housing' units . . . at the [recommended] 30-minute intervals" and requiring observation less frequently, at 60-minute intervals. (ECF No. 32-20, PageID 1338; ECF No. 32-21, PageID 1377–98.)

MCJ has not always fully complied with the Report's two "minor" recommendations on officer training either. Although the Report found that "MCSO [] ha[d] a [generally] good suicide prevention training program," it recommended that MCJ increase its "basic pre-service suicide prevention training" from five hours to eight and increase its annual suicide prevention training from one hour to two. (ECF No. 32-20, PageID 1317.) As far as the record shows, MCJ never took up the first recommendation. And it only fell in line with the latter in late 2021. (ECF No. 32-21, PageID 1400–01; ECF No. 32-37.)

**More people incarcerated in MCJ commit suicide.**

Despite Hayes' Report, and any changes that MCJ made in response to it, at least 23 people incarcerated at MCJ have committed suicide since 2010. (ECF No. 32-2, PageID 587–88.) 21 of these people hanged themselves with sheets or blankets; one stabbed himself in the neck with a razor; and one is the decedent in this case, who choked himself with a towel. (ECF No. 32-2, PageID 587–88.)

Many lawsuits stemmed from these suicides, and in at least two of these suits, other people incarcerated at MCJ complained of a lack of care from the officers there. In the first case, Rettia Macleod and Sue Pregizer testified that in July 2013

4

"[t]he corrections officers were doing nothing to help [Jennifer Meyers, the decedent in that case], no matter how many times medical kites for [Meyers] were turned in to the guards." (ECF No. 32-43; ECF No. 32-44.) In the second case, Jeremy Gordon and Joseph Piasecki testified that when they were in MCJ in July of 2017 officers "rarely respond[ed] to [their] requests for help when [they] used the intercom system." (ECF No. 32-41, PageID 2203, 2257–63; ECF No. 32-42.)

**In 2018, Kalieb Solomon, the decedent in this case, is booked and screened.**

On September 28, 2018, Kalieb Solomon, the decedent in this case, was arrested and charged with armed robbery (and related offenses). (ECF Nos. 27-2, 6.) Three days later, he was booked into MCJ. (ECF No. 27-4.)

During the booking process, Solomon and those assessing him answered "no" to a series of questions meant to determine whether he was a suicide risk. Specifically, on an MCJ "Initial Classification / Temporary Cell Assignment" form, Screening Deputy Backers indicated that Solomon stated that he was not "contemplating suicide" nor "experiencing visual or auditory hallucinations," that he had not "experienced any suicidal or self-injury behavior in the past 3 months," that he was not "arriving to the jail directly from a hospital or psychiatric facility where [he] had received treatment for a suicide attempt," and that he did not "have a history of recent psychiatric hospitalization occurring within 1 month prior to admission to the jail." (ECF No. 27-4, PageID 280.) On that same form, Deputy Backers indicated that

Solomon was not "talking to himself," "appearing confused or incoherent," or "refusing to answer questions regarding mental health history," that Solomon's crime was not "unusually shocking or heinous in nature," that Solomon was not "a person of respect in the community or high profile," and that the screening deputy did not "believe [Solomon] [was] not being honest during [the] assessment." (ECF No. 27-4, PageID 280.)

A screening completed by Wellpath Medical, MCJ's medical service provider, returned similar results. On Wellpath's "Receiving Screening" form, Registered Nurse Zachary Year[1] indicated that it was not Solomon's first arrest and his charges did not include murder, kidnapping, or a sexual offense, that Solomon's "[a]rresting or transporting officer" did not believe that Solomon was "a suicide risk," and that Solomon did not "[l]ack[] close family/friends," was not "[w]orried about major problems other than [his] legal situation," did not have family members or a significant other or close friends who had "attempted or committed suicide," did not have a history of psychiatric treatment or taking psychotropic medications, did not hold a "position of respect in [the] community," had not committed a "shocking" crime, had not "[e]xpresse[d] thoughts about killing" himself, did not have "a suicide plan and/or suicide instrument in possession," had not previously attempted suicide,

---

[1] This could be a misspelling; it is difficult to read the handwritten name on this form.

had not "[e]xpresse[d] feeling [that] there [was] nothing to look forward to in the future (feelings of helplessness and hopelessness)," had not "[s]how[ed] signs of depression" such as "crying or emotional flatness," did not "[a]ppear[] overly anxious, afraid or angry" nor "to feel unusually embarrassed or ashamed," was not "acting and/or talking in a strange manner" by, for example, not focusing or "hearing or seeing things not there," and was not "apparently under the influence of alcohol or drugs." (ECF No. 27-5, PageID 284.) Nurse Year further indicated that Solomon appeared alert and was speaking and behaving appropriately, following a logical thought process, and exhibiting an appropriate affect and mood. (ECF No. 27-5, PageID 285.) He recommended that MCJ place Solomon in a "General Population" housing unit. (ECF No. 27-5, PageID 286.)

Two days later, on October 3rd, an MCJ officer assigned Solomon to the security class level of 7 ("close"), on a scale from level 1 ("very low") to level 8 ("maximum"). (ECF No. 27-6, PageID 288.)

Eight days after that, Registered Nurse Jamie Koelder[2] completed a Wellpath Medical History and Physical Assessment with Mental Health form for Solomon. (ECF No. 27-7.)  After asking Solomon many of the same suicide risk questions

---

[2] The spelling of this name is also difficult to decipher.

listed above, Nurse Koelder found that he had "[n]o mental health problems" and approved him for "General Population" housing. (ECF No. 27-7.)[3]

**Solomon is judged competent to stand trial.**

One week later, on October 17th, the judge presiding over Solomon's armed robbery case—the Honorable Russell Ethridge of the 39th Judicial District Court for Macomb County—referred Solomon to the Michigan Department of Health and Human Services' Center for Forensic Psychiatry ("MCFP") "for evaluation of Competency to Stand Trial and Criminal Responsibility." (ECF No. 32-6, PageID 774.)

On January 16, 2019, Consulting Forensic Examiner Ellen Garver, Ph.D., on behalf of MCFP, returned her opinion to Judge Ethridge that "Solomon [was] competent to stand trial." (ECF No. 32-6, PageID 774.) Dr. Garver opined that "Solomon demonstrated a good understanding of the nature and object of the proceedings against him" and that his "lack of cooperation with his attorney and the court [was] volitional," rather than "related to a mental health condition." (ECF No. 32-6, PageID 778–79.) She based this opinion on "[c]linical interviews lasting approximately two hours and 20 minutes on Nov. 15, 2018," her "[r]eview of records from the Michigan Department of Corrections" and "of court orders and Roseville

---

[3] Nurse Koelder did also note that Solomon had a "[h]istory of substance abuse/treatments" and had last used marijuana on October 1, 2018. (ECF No. 27-7, PageID 294.)

Police Department Case Reports and Supplemental Reports, dating from September 27, 2018 through October 1, 2018," and her contact with "the office of [Solomon's] defense counsel." (ECF No. 27-8, PageID 298.)

As to Solomon's mental health, Dr. Garver concluded that Solomon "did not appear significantly depressed nor overwhelmingly anxious." (ECF. 32-6, PageID 777.) She noted that Solomon said that, sometimes, when he was watching the television, "dialogue plays out like it was meant for me," but she "consider[ed] this to be a coincidence, such as when someone hears a song that specifically relates to something he or she is going through at that time," especially in light of the fact that "Solomon denied a variety of unusual experiences sometimes associated with severe mental illness." (ECF No. 32-6, PageID 776.) She also noted that Solomon "said he threatened to kill himself once or twice while in prison" and "said . . . he [once] 'lost it,' after" a search of his cell. (ECF No. 32-6, PageID 776.) But she did not raise any alarm about these events; instead, she emphasized that Solomon "denied significant current difficulties coping with incarceration, such as agitated and/or suicidal behavior necessitating administrative segregation," "denied he has ever attempted suicide and that he is currently suicidal," and "denied a variety of experiences typically associated with depression." (ECF No. 32-6, PageID 775–76.)

**Solomon is issued rule violations while awaiting trial and placed in "Max."**

On April 25, 2019, Solomon was issued a Minor Rule Violation for being "in possession of a destroyed towel – using pieces as a wash cloth." (ECF No. 27-9, PageID 300.) He lost his telephone, visiting, and commissary privileges for about a week, and was instructed to "[f]ollow [j]ail [r]ules." (ECF No. 27-9, PageID 300.)

On June 26, 2019, Solomon was issued a Major Rule Violation for "trying to remove concrete in an att[empt] to escape." (ECF No. 27-10, PageID 302.) He was put in "[d]isciplinary [s]egregation" for thirty days, until July 26, and he lost his commissary privileges from July 24 through August 23. (ECF No. 27-10, PageID 302.) Around this time, Solomon's 'classification was moved up to a level 8" and he "was moved to maximum security" Unit 3 ("Max 3"). (ECF No. 32-8, PageID 797.)

**Solomon files suit against Governor Whitmer.**

On August 5, 2019, while still incarcerated at MCJ, Solomon filed a federal lawsuit against Michigan Governor Gretchen Whitmer and Macomb County Circuit Judge Kathryn Viviano, alleging that he had been "unlawfully labelled as 'Black'" in violation of the Thirteenth Amendment. (ECF No. 32-9.) He stated that this classification "psychologically crippled" him and yet he had not "receive[d] any mental therapy." (ECF No. 32-9, PageID 811.) (The case was summarily dismissed on April 29, 2020. *See* Order of Summary Dismissal, *Solomon v. Whitmer*, No. 19-12298 (E.D. Mich. Apr. 29, 2020), ECF No. 5.)

**Solomon is convicted of armed robbery (and related offenses).**

Solomon's two-day trial (at which he represented himself) began on September 11, 2019. (ECF No. 32-8, PageID 796.) Solomon resisted attending, but eventually did so. (ECF No. 32-5, PageID 735; ECF No. 32-8, PageID 796.) On the second day, the jury found Solomon guilty of armed robbery (and related charges), and Judge Ethridge scheduled sentencing for October 23rd. (ECF No. 27-11, PageID 304.) As Solomon understood it, he faced a minimum sentence of 35 years imprisonment. (ECF No. 32-8, PageID 792.)

**Solomon commits suicide in his cell.**

Solomon was taken back to Max 3, which had a total of five individual cells. One cell was empty, and the other three were occupied by Tajon Montell Kyles, Taj Bates-Powell, and Carl Jerome Clemons. (ECF. No. 32-12, PageID 832.) Solomon told Kyles and Clemons that he was found guilty; he was also "more talkative than usual," and he "didn't call his family like he usually" did. (ECF No. 32-8, PageID 790–92.)

Pursuant to a General Order that went into effect on May 1, 2018, MCJ "[i]nmates on Regular Confinement status [were to] be observed [through security rounds] at intervals not to exceed 60 minutes." (ECF No. 27-14, PageID 316.) (Incarcerated people on suicide watch, however, were to "be watched continuously" or in "unpredictable . . . intervals no more than 15 minutes apart." (ECF No. 27-14,

PageID 316.)) In Max 3, security rounds were conducted at 4:49 PM; 5:40 PM; 6:36 PM; 7:02 PM; 8:01 PM; 8:45 PM; 9:37 PM; 10:32 PM; 11:18 PM; and 12:14 AM. (ECF No. 27-13, PageID 308–14.)

On the night of the 12th, Defendants Corrections Officers Ryan Stempniewski and Timothy Rickert were on duty in Max 3. Stempniewski conducted his 11:18 PM round as scheduled, and he did not see anything out of the ordinary. (ECF Nos. 27-15, 27-16.)

Shortly after Stempniewski finished that round, Kyles and Bates-Powell heard "choking" and "kicking" sounds. (ECF No. 32-3, PageID 606–07; ECF No. 32-12, PageID 835, 854.) After they realized that the sounds were coming from Solomon's cell, they "started screaming [their] heads off" and "banging on the bars." (ECF No. 32-12, PageID 836.) In response to this commotion, Rickert turned on the single intercom in Max 3, asked what was going on, and instructed one person to speak at a time, so that he could understand them. (ECF No. 27-20, PageID 373; ECF No. 32-3, PageID 635–51; ECF No. 32-12, PageID 835, 867–68.) What happened next is in dispute.

According to Kyles and Bates-Powell, Kyles then explained, by himself, that Solomon was committing suicide. (ECF No. 32-3, PageID 635; ECF No. 32-12, PageID 868.) Rickert "comprehended" that statement but nonetheless responded that

he could not do anything about it, because he was alone and Stempniewski had just

done his round. (ECF No. 32-3, PageID 635–40; ECF No. 32-12, PageID 836.)[4]

According to Rickert, on the other hand, "[w]hat [he] heard Kyles say was that

he wanted to talk to [Rickert] and move to GP (General Population)." (ECF No. 27-

20, PageID 373.) Rickert told Kyles that he "was the only [officer] on the floor."

(ECF No. 32-13, PageID 895.) Kyles then "started talking to an unknown inmate in

the same unit in a soft tone," without any hint of "urgency." (ECF No. 27-20, PageID

373; ECF No. 32-13, PageID 897.) Rickert "listened for a few minutes as they talked

---

[4] At the summary judgment Hearing, Defendants' counsel argued that the Court should disregard Kyles' and Bates-Powell's accounts of this incident because each account is internally inconsistent. The Court acknowledges that both men have at points testified (at least arguably) inconsistently, but, viewing the facts in the light most favorable to Plair, the Court nonetheless finds the above account sufficiently credible to at least create a genuine dispute of fact.

In his deposition for this case, on October 28, 2022, Kyles initially testified that Rickert "told [them] to shut the fuck up" and never said that he could not understand them when they were all talking at once. (ECF No. 32-3, PageID 607–14.) But he was then shown a video in which he relayed the above version of events to MCJ Sergeants on September 13, 2018. (ECF No. 32-3, PageID 620.) After watching that, Kyles stated that the video refreshed his memory and represented his truthful testimony. (ECF No. 32-3, PageID 639.) The Court finds this explanation plausible.

Similarly, in his October 28, 2022 deposition for this case, Bates-Powell initially affirmed that he, Kyles, and Clemons were "screaming . . . at the same time," and he did not mention Kyles speaking alone. (ECF No. 32-12, PageID 836.) But later, after he was shown a video of the account he gave on September 13, 2018 and was asked directly whether one person spoke ever spoke alone, he stated that "one person [eventually] explained" to Rickert that Solomon was committing suicide. (ECF No. 32-12, PageID 867–68.) This inconsistency appears to reflect a minor miscommunication rather than a credibility-shattering contradiction.

to each other calmly," he heard "GP," and then he "turned the intercom off." (ECF No. 27-20, PageID 373; ECF No. 32-13, PageID 898.)

Rickert testified that "in . . . training" he had been told "that when an inmate communicates through the intercom to tell [Rickert] his needs, [Rickert is] supposed to address those needs." (ECF No. 32-13, PageID 945–46.) He also testified that there was nothing "preventing [him] from notifying [] Stempniewski to go check on [] Kyles" and he "knew [he] had that option." (ECF No. 32-13, PageID 899.)

In any event, at 12:10 AM on the 13th, Rickert went to Max 3 to conduct the next security round. (ECF No. 27-20, PageID 373.) Kyles told him to check on Solomon's cell. (ECF No. 27-20, PageID 373.) Rickert "looked into [the] cell" and saw Solomon "laying on his back on top of his bunk with his feet hanging over the side and something wrapped around his neck." (ECF No. 27-20, PageID 373.) He "went back to the duty station" and told Stempniewski what he had seen; Stempniewski "handed [him] the cut down tool, turned on the day lights and opened" Solomon's cell. (ECF No. 27-20, PageID 373.) Rickert entered the cell and saw "[a] towel tightly wrapped around Solomon's neck." He "shook Solomon['s] legs" and received no response. (ECF No. 27-20, PageID 373.)

"Deputy Scardino arrived on the scene and assisted taking the towel off. Nursing staff and officers arrived. Solomon had no pulse and was placed on the cell floor to begin CPR." (ECF No. 27-20, PageID 373.) The "CPR continued for 11 minutes

14

until Med Star and fire department person[nel] arrived and took over." (ECF No. 27-20, PageID 373.) Finally, "[a]fter attempt[s] to revive Solomon w[ere] unsuccessful, Med Star declared Solomon deceased." (ECF No. 27-20, PageID 373); *see also* (ECF No. 32-8, PageID 789).

**MCJ and Wellpath investigate Solomon's death.**

That same day, September 13th, Rickert filed a Jail Incident Report. (ECF No. 27-20.)

Then-Sergeant (now Lieutenant) Michael Christopher Shorkey, who worked in the Sheriff Department's Office of Professional Standards, completed a death investigation. (ECF No. 32-5, PageID 682.) He found two notes on the desk in Solomon's cell. The first contained handwritten verse that read:

> "Death becomes your ally [w]hen life is your enemy"
> "Out, Out, brief candle. Lifes but a walking shadow,
> A poor player that struts and frets his hour upon the stage
> and then is heard no more, it is a tale told by an idiot,
> full of sound and fury, signifying nothing"

(ECF No. 32-8, PageID 787.) The second contained the following handwritten list (with every entry but number two crossed out, as shown):

> Ways to Be free
>
> 1)   ~~Natural causes – Death~~
> 2)   Suicide
> 3)   ~~Prison time – Eventual release~~
> 4)   ~~Escape~~
> 5)   ~~Win trial~~
> 6)   ~~Motion for dismissal~~

~~7)    Lawsuit~~
~~8)    Lack of victim – dismissal~~
~~9)    Bond out~~
~~10)   Pray to God~~

(ECF No. 32-8, PageID 787.)

Shorkey also interviewed Kyles, Bates-Powell, and Clemons on the 13th. They all told Shorkey that Solomon's suicide came as a surprise to them, because Solomon had never told them that he wanted to commit suicide nor shown any signs that he intended to do so. (ECF No. 32-8, PageID 790–92.) (Solomon's ex-fiance and the mother of his child, Plaintiff Brielle Plair, testified, in her deposition for this case, that the suicide came as a surprise to her too. (ECF No. 27-27, PageID 444, 446–47.)) Kyles further suggested that "Solomon waited for the deputy to finish his round before he" took action. (ECF No. 32-8, PageID 791.)

After conducting these interviews, Shorkey performed an "intercom test" in Max 3. He determined that the people in the Max 3 cells could hear the deputy in the duty station over the intercom fairly well and that the deputy could hear the people in Max 3, though less well. (ECF No. 32-8, PageID 798.) Specifically, he found that "it was nearly impossible [for the deputy] to understand what was being said when [three people in the cells] were all shaking the bars and yelling at the same time," and "even when one person was speaking and it was relatively quiet in the cellblock it was [still] difficult to understand and [the deputy] had to concentrate to figure out what was being said." (ECF No. 32-8, PageID 798.)

Shorkey concluded that "Solomon's suicide, although tragic, was not due to the staff of the [MCSO]." (ECF No. 32-8, PageID 798.) He noted that "[t]here were no indicators detected from previous medical evaluations or recent indicators noticed by the cellmates or correction deputies that there were any suicidal tendencies demonstrated by [] Solomon." (ECF No. 32-8, PageID 99.) And he found that "[t]he corrections deputies on duty during the incident responded appropriately given their level of training and experience once the emergency was discovered." (ECF No. 32-8, PageID 798–99.) To that last point, he added that Kyles, Bates-Powell, and Clemons "admitted that . . . [Rickert] likely would have had a difficult time understanding them due to the amount of noise they were making" and confirmed that, "[a]fter they made contact with [Rickert] over the intercom, they did not try to make contact with him again when no one responded right away." (ECF No. 32-8, PageID 799.)

Wellpath also completed a "Psychological Autopsy" and a "Mortality & Morbidity Report and Review." (ECF No. 32-14.) In the Autopsy, Regional Director of Mental Health Michelle Reed, LPC, LCP, noted that Solomon's "contact with medical staff was limited to the receiving screening and health and physical" and "[h]e was not referred or seen by mental health and no mental health concerns were noted or endorsed." (ECF No. 32-14, PageID 969.) She opined that Solomon's conviction "was likely the catalyst for" his suicide. (ECF No. 32-14, PageID 969.)

And she offered the following "[r]ecommendations": "Improve communication regarding patients receiving long sentences at court to mental health. Increase poster presence for Shine the Light on suicide prevention. Make videos to play on close circuit TV's in the facility regarding suicide prevention for both patients and staff." (ECF No. 32-14, PageID 969.)

In the Report and Review, Registered Nurse Lara Ianitelle[5] indicated that "applicable procedures" had been followed, there had been "[a]ppropriate communication," the "[e]mergency response was appropriate," and Solomon's "care . . . throughout incarceration" had been "safe," "timely," "effective," "efficient," "equitable," and "patient centered." (ECF No. 32-14, PageID 971–72.) She also indicated that there were no "concerns regarding the clinical provision of care (including interventions provided preceding and during the event)" and there was no issue regarding a "[l]ack of or missed interpretation of information." (ECF No. 32-14, PageID 971.) Ultimately, she found that there were "no deficiencies" associated with Solomon's death," but that there was one "factor[] that may have contributed to th[e] incident that need[ed] to be addressed through changes or adoption of policies, procedures or training": the need for "more training with court and transport deputies." (ECF No. 32-14, PageID 972–73.)

---

[5] The spelling is again difficult to decipher here.

**Kyles and Bates-Powell criticize MCJ's officers.**

In their depositions for this case, both Kyles and Bates-Powell maintained that the intercom system worked perfectly well and that they had successfully communicated with corrections officers using it in the past. (ECF No. 32-3, PageID 640; ECF No. 32-12, PageID 871.) They also testified that officers often failed to provide adequate care to those incarcerated in MCJ. Kyles described the care as "inadequate," said that the officers acted like "assholes on purpose," and emphasized that "[y]ou got to damn near be dying for them to just come take you out of your cell." (ECF No. 32-3, PageID 610, 641–42.) Likewise, Bates-Powell discussed an "incident where [his] arm was cut open" and he "had to have [his] mom call up there to get medical attention." (ECF No. 32-12, PageID 843.) He further stated that he had observed officers neglect other incarcerated people and that the officers generally "don't treat [requests for medical attention] with very much urgency." (ECF No. 32-12, PageID 843.)

**MCJ institutes 30-minute rounds in Max, for about a year.**

After Solomon's death, MCJ reinstituted 30-minute rounds in Max. (ECF No. 32-21, PageID 1392.) A little over a month later, on October 17, 2019, MCJ reversed course and returned to 60-minute rounds there. (ECF No. 32-21, PageID 1392–94.)[6]

---

[6] In contrast to the impression given by the testimony cited above, Defendants' counsel stated at the summary judgment Hearing that MCJ stopped using Max after Solomon's death. The Court need not resolve the exact details on this point.

But then someone else incarcerated at MCJ, Steven Long, committed suicide on October 19th, and MCJ reversed course again, instituting 30-minute rounds for all housing units (besides, presumably, those units that already had more frequent rounds, such as the suicide unit). (ECF No. 32-21, PageID 1382–85, 1394.)

**MCJ increases annual suicide prevention training**.

On October 26, 2021, MCJ increased its officers' annual suicide prevention training from one hour to four, pursuant to a settlement agreement in a different case. (ECF No. 32-21, PageID 1400–01; ECF No. 32-37.)

Unfortunately, at least one person incarcerated at MCJ has committed suicide since. (ECF No. 32-21, PageID 1402.)

### III. PROCEDURAL HISTORY

On September 27, 2021, Plair, as personal representative of Solomon's estate, filed suit against Macomb County, Stempniewski, and Rickert. (ECF No. 1.) About two weeks later, she amended her complaint. (ECF No. 3.) In her Amended Complaint, she asserts the following counts:

I)   Cruel and Unusual Punishment in violation of the Eighth Amendment, cognizable under 42 U.S.C. § 1983, against all three defendants;

II)  Cruel and Unusual Punishment in violation of the Fourteenth Amendment, under the *Kingsley* standard, cognizable under 42 U.S.C. § 1983, against all three defendants;

20

III)   Failure to Train in violation of the Eighth and/or Fourteenth Amendments, cognizable under 42 U.S.C. § 1983, against Macomb County;

IV)   Unlawful Custom, Policy or Practice – Laxity in violation of the Eight and/or Fourteenth Amendments, cognizable under 42 U.S.C. § 1983, against Macomb County; and

V)   Gross Negligence, against Stempniewski and Rickert.

On December 7, 2021, the three Defendants answered the Amended Complaint. (ECF No. 12.)

On February 13, 2023, the Court entered a Stipulated Order dismissing Stempniewski from this case without prejudice. (ECF No. 23.)

On February 28, 2023, the two remaining Defendants, Macomb County and Rickert, moved for summary judgment on all counts. (ECF No. 27.) Plair responded on March 21, 2023. (ECF No. 32.) The Court held a Hearing on the motion on July 27, 2023.

## IV. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich.

2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Still, the non-movant must produce enough evidence to allow a reasonable jury to find in her favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. And the Court may only consider evidence that could be presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

"The 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Rather, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the

case." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In other words, "'[t]he central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## V. DISCUSSION

For the reasons that follow, the Court will **A) GRANT** Rickert's Motion for Summary Judgment on Plair's Eighth Amendment claim but **DENY** his Motion for Summary Judgment on her Fourteenth Amendment claim; **B) GRANT** Rickert's Motion for Summary Judgment on Plair's negligence claim; and **C) GRANT** Macomb County's Motion for Summary Judgment on Plair's Affirmative Policy, Failure to Train, and Custom of Inaction claims.

## A. The Court GRANTS Rickert summary judgment on Plair's Eighth Amendment claim but DENIES him summary judgment on her Fourteenth Amendment claim.

Plair alleges that Rickert violated Solomon's Eighth and Fourteenth Amendment rights to be free from deliberate indifference to his serious medical needs by failing to take action when Kyles informed Rickert that Solomon was committing suicide. (ECF No. 3; ECF No. PageID 551–60.) Rickert asserts that Solomon's right here

stems from the Eighth Amendment, rather than the Fourteenth, and that Rickert is entitled to qualified immunity from this claim. (ECF No. 27, PageID 246–54.)

The Court will first establish that Plair's constitutional claim against Rickert arises out of the Fourteenth Amendment, and not the Eighth. Then it will find that Rickert is not entitled to qualified immunity from this claim.

*1. Plair's claim against Rickert arises out of the Fourteenth Amendment.*

The Eighth Amendment provides that "no[] cruel and unusual punishments [shall be] inflicted" by the State. Section One of the Fourteenth Amendment provides that "[no] State [shall] deprive any person of life, liberty, or property, without due process of law." Both of these provisions protect people in jail or prison from "deliberate indifference to [their] serious medical needs." *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 605 (6th Cir. 2022).

But these protections against deliberate indifference do not overlap. "Eighth Amendment scrutiny is appropriate only after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions," because "the State does not acquire the power to punish with which th[at] Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) (citing *United States v. Lovett*, 328 U.S. 303, 317–18 (1946) and *Kennedy v. Mendoza-Martinez*, 372 U.S. 133, 162–67, 186 (1963)). "Where the State seeks to

24

impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id.*

"The Supreme Court has not directly addressed whether the Eighth Amendment is applicable to pre *sentencing* detainees," like Solomon was here, "but it has indicated that the answer is no." *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). Indeed, in 1979, in *Bell v. Wolfish*, the Court juxtaposed "pretrial detainee[s]" who may "not be punished" with "*sentenced* inmate[s who], on the other hand, may be punished," just not cruelly and unusually. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (emphasis added) (citing *Ingraham*, 430 U.S. at 671–72 n.40). And ten years later, in *Graham v. Connor*, the Court unambiguously stated, albeit in dicta,[7] that "the Eighth Amendment's protections d[o] not attach until after conviction *and sentence*." *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989) (emphasis added) (citing *Ingraham*, 430 U.S. at 671 n.40).

Although the Sixth Circuit has not extensively nor definitively addressed the issue either, it has indicated the same thing. For example, In *Richko v. Wayne*

---

[7] *See generally Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 66–67 (1996) ("We adhere in this case, however, not to mere *obiter dicta,* but rather to the well-established rationale upon which the Court based the results of its earlier decisions. When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (discussing how to "separate holdings from dicta").

*County*, the Circuit stated that "the Eighth Amendment applies only to those individuals who have been tried, convicted, *and sentenced.*" *Richko v. Wayne Cnty., Mich.*, 819 F.3d 907, 915 (6th Cir. 2016) (emphasis added) (citing *Bell*, 441 U.S. at 535 n.16 and *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985)); *see also Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) ("[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals *serving their sentences.* When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment." (emphasis added) (internal citation omitted)). Many other courts, both within and outside of the Sixth Circuit, have indicated the same. *See, e.g.*, *Lewis*, 581 F.3d at 474 (". . . Eighth Amendment rights had not yet vested in Lewis, who had not been sentenced. . . . [T]he basis for his § 1983 action should have been the Fourteenth Amendment Due Process Clause."); *Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000) ("When Fuentes was placed in the restraint chair he was a convicted inmate awaiting sentencing. His status under the Constitution was therefore that of a pretrial detainee. . . . [U]nder the Fourteenth Amendment, he has federally protected liberty interests that are different in kind from those of sentenced inmates." (internal paragraph breaks and indentation omitted)), *abrogated in part on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) ("the Eighth Amendment's protection does

not apply until after conviction and sentence" (internal quotation marks omitted));

*Fuller v. Correct Care Sols., LLC*, No. 17-cv-661, 2022 WL 4355638, at *5 (W.D.

Ky. Sept. 20, 2022) (". . . Fuller was a pre-trial detainee at LMDC from June 9th

until June 16th, 2016, when he was sentenced to serve a ninety-day sentence.

Therefore, the claim for the early portion of his incarceration falls under the

Fourteenth Amendment standard. Thereafter, . . . the Eighth Amendment standard

applies."); *United States v. Cole*, 459 F. Supp. 3d 116, 123 (D.D.C. 2020) ("[T]he

Eighth Amendment does not apply here, because Cole is a pretrial detainee. The

Eighth Amendment's protections do not attach until after conviction and sentence."

(internal quotation marks omitted)); *Johnson v. Clafton*, 136 F. Supp. 3d 838, 843

(E.D. Mich. 2015) ("[A]s a pretrial detainee (according to an online offender

database, Johnson was not sentenced until February 2013), the Fourteenth

Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual

Punishment Clause, provided Johnson with constitutional protection from

inadequate care for serious medical needs . . . ."); *Williams v. Savory*, 87 F. Supp.

3d 437, 452 (S.D.N.Y. 2015) ("The Eighth Amendment does not attach until after

conviction and sentencing, as it was designed to protect those convicted of crimes."

(internal quotation marks omitted)); *Stevens v. Gooch*, 48 F. Supp. 3d 992, 1003

(E.D. Ky. 2014) ("Eighth Amendment protection against cruel and unusual

punishment does not attach until after conviction and sentence."), *aff'd by* 615 F.

App'x 355 (6th Cir. 2015) (affirming without commenting on the portion of the district court's decision quoted here); *Heath v. Brown*, No. 08-cv-248, 2010 WL 3239035, at \*2 (W.D. Ky. Aug. 16, 2010) ("Because Plaintiff had not been convicted and sentenced at the time of the alleged conduct in the complaint, the Eighth Amendment does not apply."); *Slade v. Wash. Cnty. Det. Ctr.*, No. 05-cv-210, 2007 WL 2227521, at \*4 (E.D. Tenn. July 31, 2007) ("the Eighth Amendment does not apply until after conviction and sentence" (internal quotation marks omitted)); *Burr v. Burns*, No. 04-1118, 2005 WL 1969532, at \*6 (S.D. Ohio Aug. 12, 2005) ("The Eighth Amendment's protections do not attach until after conviction and sentence.").

The Court sees good reason to follow this guidance. In the Court's view, the structure of the post-conviction process supports the position that punishment is premature before sentencing. Generally, when a defendant is convicted of a crime, he is not immediately sentenced to a term of imprisonment. Instead, the judge schedules a sentencing hearing for a later date, and she might even allow the defendant to wait for that sentencing at home, rather than in jail. *See* 18 U.S.C. § 3143. When the sentencing date arrives, the judge is constitutionally obligated to determine the sentence in accordance with due process of law. *See Townsend v. Burke*, 334 U.S. 736, 741 (1948). And until the judge does that, and announces the result, neither the jail system, nor the prosecutor, nor the defendant himself knows what the sentence will be; in some cases, they may not even know whether the

defendant will be sentenced to any term of imprisonment at all. This all raises the question: how could jail officers legally execute any definite punishment before then? *But see Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished.").

*Davis v. Chorak*, the only case cited by Rickert in support of the contrary position, is not binding on this Court and does not outweigh the above considerations. In *Davis*, the District Court for the Western District of Michigan ruled that the plaintiff's claims that Eaton County Jail and its officers failed to protect him from an attack that occurred after he pled guilty to a crime, but before he was sentenced, arose out of the Eighth Amendment, rather than the Fourteenth. *Davis v. Chorak*, 624 F. Supp. 3d 870, 879 (W.D. Mich. 2022).[8] The District Court relied on two cases to support that ruling: *Morgan by Morgan v. Wayne Cnty.*, 33 F.4th 320 (6th Cir. 2022) and *Uraz v. Ingham Cnty. Jail*, No. 19-cv-550, 2019 WL 4292394 (W.D. Mich. Sept. 11, 2019). *Id.*

---

[8] On appeal, the Sixth Circuit did not decide whether Davis' claim arose from the Eighth or Fourteenth Amendment. Instead, the Circuit "g[a]ve Davis the benefit of the doubt and assume[d] he was a pretrial detainee" whose claim arose from the Fourteenth. *Davis v. Chorak*, No. 22-1839, 2023 WL 2487339, at *2 (6th Cir. Mar. 14, 2023).

*Morgan* is inapposite, because there the plaintiff was awaiting trial on one charge but also "serving a *sentence* for an[other] conviction." *Morgan by Morgan*, 33 F.4th at 323–26 (emphasis added).

And *Uraz* is neither binding on this Court nor wholly persuasive to it. In *Uraz*, the District Court for the Western District of Michigan relied on *Bell* to hold that the plaintiff's claims of post-guilty-plea, pre-sentencing mistreatment arose out of the Eighth Amendment. *Uraz*, 2019 WL 4292394, at *7. The Western District Court quoted *Bell*'s assertion that, "'where it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constituted punishment, "[f]or under the Due Process Clause, a detainee may not be punished *prior to an adjudication of guilt* in accordance with due process of law."'" *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 583 (1984)[9] (quoting *Bell*, 441 U.S. at 535)) (emphasis *Uraz*'s). The Court then concluded that, "[b]y entering a guilty plea that was accepted by the court, [the p]laintiff waived his right to trial. His detention, therefore, no longer qualified as 'pretrial'" and "[t]he Eighth Amendment [was] the appropriate standard to be

---

[9] *Uraz* cites *Block v. Rutherford* as "recognizing that application of a lesser standard to pretrial detainees turns on the impropriety of imposing 'punishment' on those who have not yet been convicted." *Uraz*, 2019 WL 4292394, at *7 (citing *Block v. Rutherford*, 468 U.S. 576, 583 (1984)). But *Block* does not add anything else to the discussion here: it merely quotes *Bell* as reflected above.

applied to [his] claim." *Id.* But the *Bell* quote above does not mean that a detainee necessarily *may* be punished *as soon as* he is adjudged guilty.[10] Plus, as noted earlier, by elsewhere juxtaposing "pretrial detainee[s]" who may "not be punished" with "*sentenced* inmate[s]," *Bell* implied that an unsentenced detainee might fall into the former category, for the purposes of this analysis. *Bell*, 441 U.S. at 535 n.16 (emphasis added).

Thus, the Court finds that Plair's claim here arises out of the Fourteenth Amendment. Accordingly, the Court **GRANTS** Rickert's Motion for Summary Judgment on Plair's Eighth Amendment claim.

*2. Rickert is not entitled to qualified immunity from Plair's Fourteenth Amendment claim.*

Qualified immunity is an affirmative defense that shields "government officials performing discretionary functions . . . from liability for civil damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 815–18 (1982). The purpose of this defense is to balance "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and

---

[10] In other words, that *Bell* quote establishes a necessary condition for punishment, but not (necessarily) a sufficient one. Moreover, *Bell*'s omission of any consideration of detainees who are *in trial*—and thus neither "pretrial," nor adjudged guilty, nor sentenced—shows that it did not intend to rule on every nuance of where Fourteenth Amendment protections end and Eighth Amendment protections begin.

liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

After an official raises the defense of qualified immunity, the plaintiff bears the burden of showing that it does not apply. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). "Under the familiar test for qualified immunity, a public official is immune from suit unless the plaintiff establishes: (1) a [statutory or] constitutional violation; and (2) that the right at issue was 'clearly established' when the [violation] occurred." *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021).[11] Judges may address these steps in either order. *Pearson*, 555 U.S. at 236.

The Court finds that Plair has established a triable issue as to whether Rickert violated Solomon's Fourteenth Amendment right to be free from deliberate indifference and that this right was clearly established when the alleged violation occurred.

---

[11] Some Sixth Circuit panels have added a third step, in which "the Court determines if the plaintiff has offered evidence sufficient to show that the official's conduct was objectively unreasonable in light of the clearly established constitutional right at issue." *Gray v. City of Detroit*, 399 F.3d 612, 615 (6th Cir. 2005); *see also* E. Lee Whitwell, *How Qualified is Qualified Immunity: Adding a Third Prong to the Qualified Immunity Analysis*, 43 Campbell L. Rev. 403, 415–16 (2021) (stating that the Sixth Circuit's position on whether to add a third prong to the qualified immunity analysis "is perhaps the murkiest" of all the circuits, "as different panels of the Sixth Circuit expressly disagree *with each other* about the issue"). This Opinion uses the traditional two-step analysis, but the Court notes that adding the third prong would not change the outcome here.

> i. There is a genuine dispute of fact as to whether Rickert violated Solomon's Fourteenth Amendment right to be free from deliberate indifference to his serious medical needs.
>
> To survive summary judgment on a deliberate indifference claim [under the Fourteenth Amendment], a plaintiff must "present evidence from which a reasonable jury could find that (1) [] the detainee had an objectively serious medical need; and (2) the defendant's action (or lack of action) was intentional (not accidental) and []he either (a) acted intentionally to ignore the detainee's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee.

*Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting

*Brawner v. Scott Cnty. Tenn.*, 14 F.4th 585, 597 (6th Cir. 2021) (internal alteration

marks omitted)); *see also Mercer v. Athens Cnty., Ohio*, 72 F.4th 152, 160–61 (6th

Cir. 2023) (reiterating that this test applies to Fourteenth Amendment deliberate

indifference claims).

Plair argues that a reasonable jury could find that she has satisfied this test. First,

she observes that "Solomon needed medical attention during his mental health

emergency, leading to his self-strangulation." (ECF No. 32, PageID 555.) Next, she

asserts that "Rickert acted deliberately (not accidentally) by choosing to remain in

the duty station [and to not contact Stempniewski] after Kyles 'drew attention to

[Rickert]' and requested to see him." (ECF No. 32, PageID 555) (quoting ECF No.

32-13, PageID 893 and 899). Then she contends that, by making this choice, Rickert

recklessly failed to reasonably mitigate the risk the medical emergency posed to

Solomon, because Rickert "knew that individuals in maximum security might be 'a

serious risk to themselves or others,' have significant 'disciplinary problems,' and should 'be under strict supervision by corrections deputies.'" (ECF No. 32, PageID 555) (citing ECF No. 32-13, PageID 888). Finally, Plair adds that a genuine dispute of fact exists as to whether Rickert also acted intentionally to ignore Solomon's need, given that Kyles testified that he "informed Rickert that Solomon was moribund *after* the other inmates stopped screaming and banging on the bars of their cells," Rickert's testimony that he had a conversation with Kyles corroborates Kyles' story, "[t]he intercom test . . . confirmed that inmates could be heard when only one inmate was speaking," and, to the extent that Rickert disputes Kyles' testimony, Rickert is not credible, due to his "history of lying during investigations of himself and other officers." (ECF No. 32, PageID 557–59) (citing ECF No. 32-3, PageID 639; ECF No. 32-5, PageID 738; ECF No. 32-13; and *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015)).

Rickert does not dispute that Solomon had an objectively serious medical need on the night that he committed suicide, nor that Rickert's lack of action was intentional rather than accidental. But Rickert does argue that Plair cannot show that he "knew of and disregarded an excessive risk to Solomon's health and safety under the standard set forth in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)." (ECF No. 27, PageID 250) (citing *Watkins v. City of Battle Creek*, 273, F.3d 682, 686 (6th Cir. 2001)). To the contrary, he asserts that "[a]t no point in time did [he] ever hear that

Solomon was committing suicide—he would have called for assistance if he had."
(ECF No. 27, PageID 253.) In support of this assertion, Rickert notes that he
"testified that he could not understand what the inmates were saying over the
intercom because they were all screaming and banging on the bars of their cells" and
all he "heard [was] Kyles say that he wanted to go to GP (general population) and
then [] the inmates talking softly to each other." (ECF No. 27, PageID 252.) He also
claims that "the intercom audio testing" "corroborated" that Max 3's "concrete walls
[] make[] it very difficult to hear when several inmates are screaming and making
noise all at once." (ECF No. 27, PageID 252.)

Because Rickert's motion maintains that Plair's claim arises out of the Eighth
Amendment, it does not address Plair's recklessness argument, which would not
support a claim under that Amendment. But at the Hearing, Rickert did contend that
it would not have been clear to a reasonable officer that Solomon may have been
committing suicide on the night of September 12th.

The Court finds that there is a genuine dispute of fact as to whether Rickert
violated Solomon's Fourteenth Amendment right to be free from deliberate
indifference to his medical needs.

First, both sides agree that Solomon had a serious medical need on the night of
September 12th. And for good reason: the Sixth Circuit has long recognized that
"psychological needs may constitute serious medical needs, especially when they

result in suicidal tendencies." *Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994); *see also Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 482 (6th Cir. 2020) (quoting *Horn*).

Second, both sides agree that Rickert's decision to not check on Max 3 nor contact Stempniewski after he spoke with Kyles was intentional rather than accidental. Nothing in the record suggests that Rickert was not acting of his own volition.

Third, viewing the facts in the light most favorable to Plair, a reasonable jury could conclude that Rickert acted intentionally to ignore Solomon's serious medical need.[12] Both Kyles and Bates-Powell testified that Kyles told Rickert, without anyone else emitting noise in the background, that Solomon was committing suicide. (ECF No. 32-3, PageID 635; ECF No. 32-12, PageID 868.) They also testified that Rickert "comprehended" this information and responded accordingly, saying that he could not do anything about it, but not that he did not understand what was happening. (ECF No. 32-3, PageID 635–40; ECF No. 32-12, PageID 836.) Furthermore, the intercom test confirmed that it was possible, albeit "difficult," for an officer in Rickert's position to understand one person speaking by himself in Max 3. (ECF No. 32-5, PageID 738; ECF No. 32-8, PageID 798.)

---

[12] For this reason, the Court need not assess Plair's alternative argument that a reasonable jury could conclude that Rickert recklessly failed to reasonably mitigate the risk Solomon's medical need posed to Solomon.

Rickert has not suggested that he would have disbelieved, or had any reason to disbelieve, Kyles. *Cf. Farmer*, 511 U.S. at 843 n.8 (stating that "a prison official" cannot "escape liability [for deliberate indifference under the Eighth Amendment] if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"). And he has conceded that he knew that he could have asked Stempniewski to go check on the situation. *See* ECF No. 27, PageID 253 (suggesting that Rickert "would have called for assistance" if he had "hear[d] that Solomon was committing suicide"); ECF No. 32-12, PageID 899. Therefore, if Rickert heard Kyles' warning and still chose to not act, that choice would amount to intentional disregard of Solomon's grave need.

To be sure, Rickert disputes this version of events and avers that he never heard anyone say that Solomon was committing suicide. (ECF No. 27-20, PageID 373; ECF No. 32-13, PageID 895–98.) But a reasonable jury could credit Kyles' and Bates-Powell's testimonies over Rickert's, especially considering Rickert's disciplinary history. *See* ECF No. 32-13, PageID 918–45.

ii. The right that Rickert allegedly violated was clearly established.

On the second step of the qualified immunity test, "clearly established" is a "demanding standard" that "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589

(2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The question governing this step is: did "the state of the law g[i]ve [the official] fair warning that [his] alleged treatment of [the injured party] was un[lawful]"? *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The answer to this question is yes only if, "at the time of the official's conduct, . . . 'every "reasonable official would understand that what he is doing"' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). This means that the law must have "clearly prohibit[ed] the offic[ial]'s conduct in the particular circumstances before him." *Id.*

Neither side has argued about whether the right at issue here was clearly established. But the Court has no trouble finding that it was. The Sixth Circuit has "clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by his doctors" and supervising officers. *Burwell v. City of Lansing, Mich.*, 7 F.4th 456, 477 (6th Cir. 2021) (evaluating the deliberate indifference claim of a pretrial detainee); *see also Mercer*, 72 F.4th at 164. It has also "consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known." *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001). In light of these precedents, any reasonable officer in Rickert's

position would have known that deliberately ignoring Solomon as he committed suicide was unlawful.

For these reasons, the Court **DENIES** Rickert's Motion for Summary Judgment on Plair's Fourteenth Amendment claim.

## B. The Court GRANTS Rickert summary judgment on Plair's negligence claim.

The Court treats a "gross negligence" claim as a standard negligence claim that contains a further allegation that the negligence was gross. *See Lippett v. Adray*, No. 18-cv-11175, 2023 WL 3774508, at *3–5 (E.D. Mich. June 2, 2023). The further allegation becomes relevant when a defendant asserts the affirmative defense of governmental immunity. Under Michigan's Government Tort Liability Act ("GTLA"), M.C.L. § 691.1407(2),

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person . . . caused by the officer [or] employee . . . while in the course of employment or service . . . if all of the following are met:
>
> (a) The officer [or] employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> *(c) The officer's [or] employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage.*

(Emphasis added.)

As to the proximate cause requirement in part (c), the Michigan Supreme Court and Michigan Court of Appeals have explained:

> The analysis . . . begins with determining whether the defendant's gross negligence was a cause in fact of the plaintiff's injuries. Provided that a defendant's gross negligence was a factual cause, the court must then consider whether the defendant was a proximate—i.e., legal—cause by addressing foreseeability and whether the defendant may be held legally responsible for his or her conduct. In addition to considering the governmental actor's conduct, it must also be decided whether there are other proximate causes of the injury. Determining if there were other proximate causes requires consideration of whether any other human actor was negligent because only a human actor's breach of a duty can be a proximate cause. . . .
>
> Once the various proximate causes have been determined, the question then becomes whether, taking all possible proximate causes into account, the government actor's gross negligence was *the* proximate cause of the injury. This requires considering defendant's actions alongside any other potential proximate causes to determine whether the defendants' actions were, or could have been, *the one most immediate, efficient, and direct cause of the injuries*. The relevant inquiry is not whether the defendant's conduct was the immediate factual cause of injury, but whether, weighing the legal responsibilities of the actors involved, the government actor could be considered *the* proximate cause.

*Ray v. Swager*, 321 Mich. App. 755, 759–60 (2017) (emphasis added) (internal quotation marks and citations to *Ray v. Swager*, 501 Mich. 52 (2017) omitted); *see also Lippett v. Corizon Health, Inc.*, No. 18-cv-11175, 2020 WL 3425044, at *3–5 (E.D. Mich. June 23, 2020).

Rickert argues that he is entitled to governmental immunity from Plair's negligence claim under the GTLA, because he "was not the one most immediate,

efficient, and direct cause of Solomon's death." (ECF No. 27, PageID 256–57.) "Rather," he insists, "it was Solomon's own actions of strangling himself that caused his death." (ECF No. 27, PageID 256–57) (citing *Est. of Winters by Nuppnau v. Santo*, No. 350573, 2021 WL 940978, at *3 (Mich. Ct. App. Mar. 11, 2021); *Kruger v. White Lake Twp.*, 250 Mich. App. 622, 648 (2002); *Cooper v. Washtenaw Cnty.*, 270 Mich. App. 506, 508–09 (2006); *Soles v. Ingham Cnty.*, 316 F. Supp. 2d 536, 546 (W.D. Mich. 2004), *aff'd by* 148 F. App'x 418 (6th Cir. 2005); *Bradley v. City of Ferndale*, 148 F. App'x 499, 514 (6th Cir. 2005); and *Perez v. Oakland Cnty.*, No. 271406, 2007 WL 914669, at *2–3 (Mich. Ct. App. Mar. 27, 2007)).

Plair responds that "Rickert's attempt to hold Solomon responsible for his own suicide, where Rickert had a duty to protect Solomon from suicide, must be rejected under *Hickey v. Zezulka*, 439 Mich. 408, 420, 443–44 (1992), *as amended on denial of reh'g* (July 13, 1992)," which "prohibits evaluation of Solomon's legal responsibility" as a proximate cause. (ECF No. 32, PageID 561–63.) In contrast, she continues, "Rickert's refusal to intervene may be '*a* proximate cause' of the suicide if Solomon's cellmates informed Rickert that Solomon was trying to commit suicide, and Rickert still did nothing." (ECF No. 32, PageID 563) (quoting *Ray*, 501 Mich. at 82). She also states that *Est. of Winters by Nuppnau* and *Kruger* "are distinguishable since neither plaintiff was in custody when they died." (ECF No. 32, PageID 561–62.)

The Court **GRANTS** Rickert's Motion for Summary Judgment on this claim, because he has established that he is entitled to governmental immunity from it. To begin with, neither party disputes that Rickert was an officer of a governmental agency, that he was acting in the course of his employment and within the scope of his authority, and that the agency was discharging a governmental function. These immunity requirements are self-evidently met here.

Next, even if Rickert's conduct constituted gross negligence that was *a* proximate cause of Solomon's death, his conduct could not have been *the* proximate cause of Solomon's death—because Solomon's own conduct was that cause. Indeed, Michigan courts have repeatedly ruled that a person's act of suicide is both *a* proximate cause of their death and *the* one most immediate, efficient, and direct proximate cause of it, including in cases where the suicide occurred in jail or prison. *See, e.g.*, *Whitley v. Mich. Dep't of Corr.*, No. 22-cv-448, 2022 WL 17480897, at *7 (W.D. Mich. Aug. 8, 2022) ("Michigan state and federal courts that have addressed the proximate cause issue in the context of prisoner suicides have consistently held that the prisoner's own suicide was the proximate cause of the death."), *report and recommendation adopted in part, rejected in part*, 2022 WL 16847679 (W.D. Mich. Nov. 10, 2022) (declining to exercise supplemental jurisdiction over the gross negligence claim and so neither adopting nor rejecting the report and recommendation's analysis of that claim); *Burks v. Eiseman*, No. 18-cv-00075, 2020

WL 1234935, at *5 (W.D. Mich. Mar. 13, 2020) ("[I]n the prison-suicide context, courts have held that a prison employee cannot be the proximate cause when an inmate commits suicide because the inmate's act of taking his or her own life is *the* proximate cause."); *Findling for Est. of Garza v. Mich. Dep't of Corr.*, No. 17-cv-18, 2019 WL 4743862, at *2 (W.D. Mich. Sept. 30, 2019) ("The Court's own research reveals that in prisoner-suicide cases, Michigan and federal courts have held that the prisoner's suicide was the proximate cause of the death. . . . [U]nder the GTLA, Garza's act of hanging himself was the one most immediate, efficient and direct cause of Garza's death."); *Est. of Jahn by Jahn v. Farnsworth*, No. 329613, 2017 WL 2263101, at *5 (Mich. Ct. App. May 23, 2017) ("The one most immediate and direct cause of Jake's death was not defendants' conduct that occurred hours earlier in the day; rather, it was Jake's own conduct, i.e., his apparent decision to intentionally drive his vehicle into a concrete pillar which caused him to sustain fatal injuries."); *Grabow v. Cnty. of Macomb*, 580 F. App'x 300, 312–13 (6th Cir. 2014) ("As in *Kruger*, it was Prochnow's own actions that were the proximate cause of her suicide."); *Cooper*, 270 Mich. App. at 509 ("We agree with defendants that the one most immediate, efficient, and direct cause of Morton's death was his own conduct."); *Bradley*, 148 F. App'x at 514 ("[T]he one most immediate, efficient and direct cause of Bradley's death was his own act of hanging himself.").

Despite Plair's assertion, *Hickey* does not provide otherwise. In that 1992 case, like in this one, the plaintiff sued as the representative of the estate of a detainee who committed suicide in jail. *Hickey*, 439 Mich. at 413. The plaintiff alleged that the jail employee defendant had been negligent in failing to prevent the suicide. *Id.* at 417. But the issue of whose actions were *the* proximate cause of the detainee's death never came up. Instead, the Michigan Supreme Court found that the defendant was not entitled to governmental immunity for another reason (based on the controlling law at the time): because she had been performing ministerial, as opposed to discretionary, acts. *Id.* at 431–35. The Court went on to find that the defendant's negligence was *a* proximate cause of the detainee's death, because his suicidal conduct was foreseeable, and then to find that the detainee's conduct should not factor into a *comparative negligence* analysis, because the defendant had a duty to protect the detainee from himself and because the detainee's conduct was intentional rather than negligent. *Id.* at 435–45. The Court never suggested that the detainee's conduct was not a, or the, proximate cause of his death.

## C. The Court GRANTS Macomb summary judgment on Plair's Official Policy, Failure to Train, and Custom of Inaction claims.

"To establish municipal liability under section 1983, [a] plaintiff must establish that: (1) [her] harm was caused by a constitutional violation; and (2) the city was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (citing *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542–43 (6th Cir.

2004) and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978)); *see also Monell*, 436 U.S. at 694 ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). The plaintiff may do this by proving "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Wright v. City of Euclid, Ohio,* 962 F.3d 852, 880 (6th Cir. 2020) (internal quotation marks omitted).

Plair brings claims against Macomb County through the first, third, and fourth methods. (ECF No. 32, PageID 565.) "Very few cases have upheld municipality liability for the suicide of a [jail] detainee." *Gray v. City of Detroit*, 399 F.3d 612, 618 (6th Cir. 2005). Here, the Court will find that all three of Plair's claims fail.

*1. The Court **GRANTS** Macomb summary judgment on Plair's Official Policy claims.*

**"**When proceeding under the first theory of [municipal] liability, [a plaintiff] must" identify the policies at issue by "show[ing] that there were formal rules or understandings—often but not always committed to writing—that were intended to, and did, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Wright*, 962 F.3d at 880 (internal quotation and alteration marks omitted). These rules or understandings "can include both implicit policies as well as [] gap[s] in expressed policies." *Morgan by Morgan*, 33 F.4th at

329. "The plaintiff must [then] demonstrate a 'direct causal link' between the polic[ies] and the alleged constitutional violation in order to show that the municipality's 'deliberate' conduct can be deemed the 'moving force' behind the violation." *Spears*, 589 F.3d at 256 (internal quotation marks omitted).

Plair alleges that three official MCJ policies caused Solomon's death: 1) that officers were to conduct rounds every 60 minutes, as opposed to every 30 minutes, in Max 3; 2) that no one would perform medical welfare checks in Max 3; and 3) that the cells in Max 3 would not each have their own emergency intercom buttons. (ECF No. 32, PageID 565–72.) Plair does not suggest that these policies moved *Rickert*, nor any other specific MCJ officer, to act with deliberate indifference to Solomon's serious medical need. Rather, she appears to assert that Macomb "itself, through [these] polic[ies], violated [Solomon's Fourteenth] Amendment rights by manifesting deliberate indifference to h[is] vulnerabilities."[13] *Morgan by Morgan*, 33 F.4th at 329; *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 390–91 (6th Cir. 2018) ("[B]ecause North has not demonstrated that any individual jail employee violated his Eighth Amendment right to adequate medical care by acting with deliberate indifference, he must show that the municipality itself, through its acts,

---

[13] Plair's briefing is, and her argument at the Hearing was, a little unclear on this point. But the above characterization represents the Court's best and most generous understanding of her claim here.

policies, or customs, violated his Eighth Amendment rights by manifesting deliberate indifference to his serious medical needs.").

The parties argue at length about the merits and consequences of these three policies.

On the first policy, Macomb contends that "implementing 30-minute rounds as opposed to 60-minute rounds . . . wouldn't have made a difference as Solomon committed suicide immediately after former CO Stempniewksi completed his round . . . , and even 15-minute rounds would not have prevented [Solomon's] death." (ECF No. 27, PageID 268.) In response, Plair faults the policy for falling short of the 30-minute rounds recommended by Hayes in 2002. (ECF No. 32, PageID 565–68) (quoting ECF No. 32-19, PageID 1218–19 and ECF No. 32-20, PageID 1334–35, 1338; citing ECF No. 32-21, PageID 1374 for the proposition that Max is a "special housing area[]"; and citing *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348–49 (7th Cir. 2016) for the proposition that "government reports can buttress a *Monell* claim"). She observes that seventeen people died from suicide at MCJ after Hayes made this recommendation and MCJ failed to implement it, then Lieutenant Lori Misch instituted 30-minute rounds "in all housing areas" and suicide deaths ceased, but then "Lieutenant Misch and Captain Walter Zimny, [] in consultation with and approved by Sheriff Anthony Wickersham," made the "deliberate choice" to return to 60-minute rounds, and "three other suicide deaths," including Solomon's,

"occurred." (ECF No. 32, PageID 567) (citing ECF No. 32-19, PageID 1221–24; ECF No. 32-21, PageID 1376–77, 1383; ECF No. 32-26; ECF No. 32-27, PageID 1655–56).

On the second policy, Macomb points out that its officers conducted rounds "at least once every hour" but does not address the topic of *medical welfare* checks. (ECF No. 27, PageID 268.) Plair responds that MCJ's policy of not requiring Wellpath to "conduct [any] welfare checks" in Max runs afoul of Hayes' "'strong[] recommend[ation]' that [it] conduct welfare checks at least three times weekly of all inmates in special housing units, such as administrative segregation." (ECF No. 32, PageID 568) (citing ECF No. 32-20, PageID 1337; ECF No. 32-32; and ECF No. 32-33). She notes that the National Commission on Correctional Health Care's Standards for Health Services in Jails also advises that "[i]nmates who are segregated and have limited contact with staff or other inmates [should be] monitored 3 days a week by medical or mental health staff." (ECF No. 32, PageID 568) (citing ECF No. 32-31, PageID 1871).

Finally, on the third policy, Macomb asserts that "the County is not required to have a 'suicide proof' jail, and there is no requirement that each cell contain an emergency call button." (ECF No. 27, PageID 268) (citing ECF No. 27-24, PageID 423 ("Any assertion by the plaintiff that the MCJ administration was obligated to have an individual intercom in every inmate cell, versus one located in each unit

common area, is frankly not supported by the requirements of the Administrative Rules for Jails and Lockups – Michigan Department of Corrections County Jail Services Unit, or contemporary corrections industry standards."); *Price v. Bailey*, 09-cv-12, 2009 WL 198962, at *3 (W.D. Mich. Jan. 26, 2009); and *Williams v. Cass Cnty. Sheriff Dep't*, 09-cv-590, 2009 WL 2370713, at *4 (W.D. Mich. July 30, 2009)). Further, it notes that "this is not a case where the intercom system was broken and the County failed to fix it. All officers testified that the intercom system works, but it is difficult to hear when several inmates are talking or yelling at once because the building is old and the walls are concrete." (ECF No. 27, PageID 269.) Plair counters that *Price* and *Williams* do not excuse MCJ's failure to install "emergency call button[s]" in each individual cell in Max. (ECF No. 32, PageID 569–71.) She states that both of these cases misread *Parsons v. Wilkinson*, 168 F.3d 490 (6th Cir. 1998) as holding that "the failure to provide an emergency call button, standing alone, does not constitute deliberate indifference," when in fact it only held that the plaintiff had "failed to demonstrate that the absence of a shower curtain and emergency call button in his cell ha[d] subjected him to a serious deprivation of life's necessities." (ECF No. 32, PageID 570.) She maintains that this case is different from *Parsons* because "the absence of an emergency call button *did* [arguably] subject Solomon to a serious deprivation of life's necessities" by rendering his "cellmates unable to" intelligibly communicate with Rickert "to summon help

during Solomon's emergency." (ECF No. 32, PageID 570) (citing ECF No. 27, PageID 244, 252). She also criticizes MCJ "for creat[ing] an environment where inmates must yell and scream to notify deputies of emergencies in" Max while, "[a]t the same time, . . . prohibit[ing] inmates from making 'excessive noise' or 'creating a disturbance' under threat of 'disciplinary sanctions.'" (ECF No. 32, PageID 572) (citing ECF No. 32-35, PageID 1939 and analogizing this situation to that of a prison "double celling inmates" in *Lareau v. Manson*, 651 F.2d 96, 108 n.11 (2d Cir. 1981)). And she notes that "Defendants' own expert says that current national standards require '[c]orrectional officer's posts [to be] located adjacent to living areas to permit officers to see and hear and respond promptly to emergency situations.'" (ECF No. 32, PageID 571) (citing ECF No. 27-25, PageID 425).[14]

In the end, the Court **GRANTS** Macomb summary judgment on all three of these "official policy" claims, because, even viewing the facts in the light most favorable to Plair, no reasonable jury could find that Macomb "acted intentionally to ignore" Solomon's "objectively serious medical need," nor that Macomb "recklessly failed to act reasonably to mitigate the risk" the need posed to Solomon, by implementing

---

[14] Macomb's Motion also has a section disclaiming liability for any "[f]ailure to properly evaluate inmates' mental health history (including completing jail detention cards and placing inmates in appropriate housing)." (ECF No. 27, PageID 269–70.) But Plair's Response does not mention this issue. Accordingly, to the extent that Plair ever meant to bring such a claim, it is now abandoned. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

these policies. *Greene*, 22 F.4th at 607. In the Sixth Circuit, "the proper inquiry concerning the liability of a [County] . . . under section 1983 for" "failure to provide [] suicide deterrence measures" "is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's medical needs." *Barber v. City of Salem, Ohio*, 953 F.2d 232, 237–40 (6th Cir. 1992). "The County has a duty to . . . take reasonable steps to prevent [a detainee's] suicide where such a risk is clear." *Perez v. Oakland Cnty.*, 466 F.3d 416, 430 (6th Cir. 2006) (internal quotation and alteration marks omitted). But "there is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide." *Gray*, 399 F.3d at 616; *see also Davis v. Fentress Cnty. Tenn.*, 6 F. App'x 243, 249 (6th Cir. 2001) ("[T]he district court correctly concluded that the right at issue here is the detainee's right to reasonable protection against taking his own life *if* that detainee has demonstrated a strong likelihood that he will commit suicide."); *Stine v. Sandusky Cnty.*, No. 19-cv-904, 2023 WL 2756987, at *7 (N.D. Ohio Apr. 3, 2023) ("Stine must show there is evidence of a strong likelihood that Groot would commit suicide before the sufficiency of Defendants' knowledge of and efforts to prevent those actions becomes relevant.").

"Strong likelihood" is "a high bar [that] typically requires evidence that the [decedent] was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm." *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir 2020). Solomon did not demonstrate such a strong likelihood of committing suicide, and the risk that he would do so was not clear, before he began to choke himself. Solomon denied that he was suicidal and did not show any signs of being suicidal in his two initial screenings with MCJ and Wellpath. (ECF No. 27-4, PageID 280; ECF No. 27-5, PageID 284.) Plair has cited no evidence that anyone at MCJ knew or should have known about Dr. Garver's report to Judge Ethridge or Solomon's federal Complaint against Whitmer.[15] Plair has cited no evidence that establishes when Solomon wrote his suicide notes or whether MCJ could or should have discovered them prior to his death. And even Solomon's cellmates in Max 3, who spoke to him after his conviction, stated that his suicide came as a surprise to them. (ECF No. 32-8, PageID 790–92.)

---

[15] Additionally, these documents did not necessarily evince a *strong* suicide risk. Although Solomon told Dr. Garver that he had "*threatened* to kill himself once or twice while in prison," he also "denied" that he had "ever attempted suicide" or was then "currently suicidal"—and Dr. Garver concluded that he "did not appear significantly depressed nor overwhelmingly anxious." (ECF No. 32-6, PageID 775–77) (emphasis added). Similarly, Solomon's Complaint against Whitmer stated that he had been "psychologically crippled" by being "labelled as 'Black,'" but it did not state that he was "suicidal" or "depressed," nor that he planned to self-harm. (ECF No. 32-9, PageID 811.)

Therefore, Macomb could not have acted with *deliberate indifference* to Solomon's serious medical needs by failing to monitor him every thirty minutes, to arrange for medical checks on him, and to install an individual emergency button in his cell, before he began to commit suicide. *Cf. Shimmel v. Moody*, No. 18-13334, 2020 WL 555281, at *6 (Feb. 4, 2020) ("[N]o reasonable jury could find that any of the four defendants knew or should have known of a strong likelihood that Shimmel would attempt suicide and *then* recklessly failed to act with reasonable care to mitigate that risk." (emphasis added) (internal citations omitted)). And by the time that Macomb learned that Solomon was suicidal—either when Rickert heard Kyles say that he was, in Plair's telling, or when Rickert found him with a towel around his neck, in Macomb's—it was too late to take any of these measures and doing so would not have made any difference.

Had MCJ received a strong warning of Solomon's serious medical need before he began to commit suicide, it would (as far as the record shows) have placed him under constant or close supervision, "not to exceed every 15 minutes." *See* ECF No. 27-14, PageID 316 (noting that those on suicide watch are monitored this frequently); ECF No. 27-4, PageID 280 (directing screening officers to refer someone coming into MCJ "to Mental Health or Medical staff immediately for determination of Suicide Watch Status" if the officer answers "yes" to any suicide risk screening question); ECF No. 32-35, PageID 1941 (reflecting the following

"Inmate Guide" instruction: "If you are experiencing any of the above [suicide warning signs] and need help, please tell an Officer immediately! If you are concerned about someone else, please tell an Officer and do not leave this person alone."). But Plair cannot hold Macomb liable—at least not under the theory that she advances here—for keeping Solomon in a cell that was not as "suicide safe" as it could have been when Macomb had no substantial reason to know that Solomon was suicidal. *Cf. Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 466–67 (6th Cir. 2001) ("Nor can we agree that the defendants were deliberately indifferent in failing to make 'a small, easy change' in their policies regarding plastic bags and blankets in the Medical Unit. At bottom, this would require that the defendants treat all inmates in the Medical Unit with the same precautions as utilized with regard to those on suicide watch . . . . On this score, the estate loses sight of the constitutional right allegedly violated. There is no general right of inmates to be protected against committing suicide.").

*2. The Court **GRANTS** Macomb summary judgment on Plair's Failure to Train claim.*

"To succeed on [] a [failure-to-train] theory, a plaintiff 'must prove that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 454 (6th Cir. 2020) (internal alteration and quotation marks

omitted) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)

and citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989)).

> In other words, a county can be held liable for lack of appropriate
> training of its deputies when "in light of the duties assigned to specific
> officers or employees, the need for more or different training is so
> obvious, and the inadequacy so likely to result in the violation of
> constitutional rights, that the policymakers of the city can reasonably
> be said to have been deliberately indifferent to the need."

*Id.* (internal alteration marks omitted) (quoting *Canton*, 489 U.S. at 389).

"'As applied to suicide claims, the case law imposes a duty on the part of

municipalities to recognize, or at least not to ignore, obvious risks of suicide that are

foreseeable.'" *Andrews v. Wayne Cnty., Mich.*, 957 F.3d 714, 724 (6th Cir. 2020)

(quoting *Gray*, 399 F.3d at 618). Where "'such a risk is clear, the municipality has

a duty to take reasonable steps to prevent the suicide.'" *Id.* (quoting *Gray*, 399 F.3d

at 618).

Macomb argues that its training program is not inadequate. It states that "the

County [took] steps to prevent future suicides from occurring before Solomon's

suicide by removing sheets from the jail" and taking other "proactive measures."

(ECF No. 27, PageID 266) (citing ECF Nos. 27-28 and 27-29.) It also observes that

"the deputies receive suicide prevention training (1) in the Corrections Academy;

(2) when they are hired with the County; and (3) on an annual basis." (ECF No. 27,

PageID 267) (citing ECF No. 32-21, PageID 1401). "In fact," it points out, "CO

Stempniewski and CO Rickert [had, in this case,] just received their two-hour annual

suicide prevention training[16] on July 24, 2019." (ECF No. 27, PageID 267) (citing ECF No. 27-31).

Macomb further argues that any inadequacies in its training program do not reflect deliberate indifference. It asserts that "there was no 'profile' that warned officials that Solomon was a suicide risk in this case, and inmates only 'have a right that city policies, training and discipline do not result in deliberate indifference to *foreseeable* and *preventable* suicide attempts.'" (ECF No. 27, PageID 263) (emphasis Macomb's) (quoting *Gray*, 399 F.3d at 619). And it relays that "out of the 19 suicides that occurred from 2000 until Solomon's suicide in 2019, only four of those occurred in maximum security—one in 2000, one in 2011, one in 2012, and one in 2015—and all of these individuals," unlike Solomon, "hung themselves using a sheet tied from the cell bars." (ECF No. 27, PageID 266.)

Finally, Macomb argues that any inadequacies in its training were not closely related to nor the cause of Solomon's death. "[A]dditional suicide prevention training would not have helped" Solomon, Macomb maintains, "since [he] never

---

[16] Though this two-hour figure might suggest that MCJ *required* that many hours annually, it does not conclusively refute Misch's testimony that MCJ only required one hour of annual suicide prevention training until October of 2021. *See* ECF No. 32-21, PageID 1400–01. For that reason, and because the Court views the facts in the light most favorable to the non-moving party at the summary judgment stage, the Court credited Misch's testimony on this point in its statement of facts. Ultimately, the issue is not dispositive.

once indicated that he was suicidal or showed signs that he was suicidal." (ECF No. 27, PageID 266.)

Plair responds by emphasizing that Macomb declined for a long time to take up multiple parties' recommendations that it increase officer training hours. She states that Macomb "did not adopt" Hayes' recommendation that it "increase[] training for correctional officers, including a discussion on predisposing factors to suicide" and an "increase [of] suicide prevention training to 2 hours annually," and that Macomb "never disciplined officers who failed to attend suicide prevention training." (ECF No. 32, PageID 572) (citing ECF No. 32-20, PageID 1316–17; ECF No. 32-36, PageID 1958–59, 1974). She also states that Macomb did "nothing" in response to United States Circuit Court Judge Bernice Bouie Donald's non-binding concurrence in *Grabow*, which asked—albeit after noting that the "current law offer[ed] no refuge" for the plaintiff—"How many times should this question come before this Court before the need for adequate suicide precautions for mentally-ill inmates becomes 'clearly established law' for which officials can be held accountable?" (ECF No. 32, PageID 573) (citing *Grabow*, 580 F. App'x at 314 and ECF No. 32-30, PageID 1812–13).

Moreover, Plair argues that "Macomb County admitted through its policymakers that additional training was needed after Solomon's mortality review was finalized." (ECF No. 32, PageID 574) (citing ECF No. 32-14; ECF No. 32-21, PageID 1418).

Yet, she continues, Misch exemplified Macomb's "deliberate indifference" when she testified that "she was 'not aware' of any policy changes that increased training" afterward and that she "did not even know what purpose the psychological autopsy or mortality and morbidity reports served." (ECF No. 32, PageID 574) (citing ECF No. 32-21, PageID 1419). Lastly, Plair highlights that Misch testified that she agreed with the recommendations for increased officer training that Wellpath made in its psychological autopsy on the suicide death of Steven Long, which occurred after Solomon's death, but also testified that she "did not know what [specific] recommendations were made" and "never communicated those recommendations to the training division." (ECF No. 32, PageID 574–75) (citing ECF No. 32-21, PageID 1419–23).

The Court **GRANTS** Macomb summary judgment on this claim, because Plair has failed to set forth evidence that MCJ's failure to adequately train its officers on some task that they must perform was "the result of deliberate indifference" and was "closely related to or actually caused" Solomon's injury. *Meirs*, 821 F. App'x at 454. To start, Plair's briefing does not explain how MCJ's training program was "inadequate to" *any particular* task that its officers must perform, let alone explain how any such inadequacy stemmed from deliberate indifference or related to Solomon's suicide. *See* (ECF No. 32, PageID 572–75.) Therefore, Plair's briefing does not establish a triable failure to train claim. *Cf. Winkler v. Madison Cnty.*, 893

F.3d 877, 903 (6th Cir. 2018) (upholding summary judgment dismissal of a claim that Madison County failed to provide adequate medical training to jail personnel in part because the plaintiff did "not identify what other medical training she believe[d] that the jail personnel should have received"); *Est. of Abbey v. Herring*, 598 F. Supp. 3d 572, 590 (E.D. Mich. 2022) (dismissing a complaint's failure to train claim because the plaintiff "ma[de] no particular allegations regarding the training Corizon provides for mental health treatment other than it must be inadequate given the care [the decedent] received").

At the Hearing, the Court asked Plair's counsel what *specific* tasks he believes MCJ inadequately trained its officers to perform. Plair's counsel responded that MCJ should have trained its rounding deputies to communicate with its transporting deputies about any issues the person being transported may be having, as the Wellpath Mortality & Morbidity Report and Review on Solomon's death recommended. *See* ECF No. 32-14, PageID 972–73. But Plair's counsel did not offer any evidence that MCJ's failure to train its officers on this type of communication *before* Wellpath recommended such training was the result of deliberate indifference. Nor did he offer any evidence that this potential training failure closely related to or caused Solomon's death. Although Wellpath's Report suggests at one point that "appropriate communication" was a "[c]ontributing factor" to Solomon's death, and at another point that its communication recommendation addresses a

"factor[] that *may* have contributed to" it, the Report does not elaborate on these suggestions. ECF No. 32-14, PageID 971–72 (emphasis added). And Plair's counsel has not provided any evidence that Solomon told the officer transporting him back from court on September 12th that he was suicidal nor that that officer had any other reason to worry about that possibility. *Cf. Downard for Est. of Downard*, 968 F.3d at 601 ("[D]espondency following an arrest," or, by extension, a conviction, "is normal and does not suggest a 'strong likelihood' of suicide."). So Plair's counsel's argument at the Hearing did not establish a triable failure to train claim either.

*3. The Court **GRANTS** Macomb summary judgment on Plair's Custom of Inaction claim.*

To prevail on an "inaction theory, where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched,"

> [a] plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (internal quotation and alteration marks and line breaks omitted) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plair argues that MCJ is liable for its custom of "ignoring requests for medical attention." (ECF No. 32, PageID 576.) Macomb recognizes the legal standard for

"an acquiescence theory." (ECF No. 27, PageID 261.) It also asserts that Plair has not "produced evidence establishing that the County ratified its deputies' misconduct" and so her claim "under a . . . 'laxity' theory fails as a matter of law." (ECF No. 27, PageID 261.) But it does not address the inaction elements listed above beyond that.

The Court finds that Plair has shown that there may have been a clear and persistent pattern of MCJ officers illegally acting with deliberate indifference to incarcerated people's serious medical needs but that Plair has failed to show that Macomb may have had notice of that pattern before Solomon's death.

> i. Plair has established a genuine dispute of fact as to whether MCJ officers had a clear and persistent pattern of illegally acting with deliberate indifference to incarcerated people's serious medical needs.

On this first element, Plair asserts that "[s]everal inmates have testified that deputies routinely ignore their medical needs." (ECF No. 32, PageID 575–76.) She cites affidavits from Macleod and Preziger swearing that when they were incarcerated at MCJ in July 2013 "[t]he corrections officers were doing nothing to help" an incarcerated woman named Jennifer Meyers, who was in severe pain from withdrawal and eventually died from it, "no matter how many times medical kites for [Meyers] were turned in to the guards." (ECF No. 32-43, PageID 2286; ECF No. 32-44, PageID 2292.) She also cites deposition testimony from Gordon and an affidavit from Piasecki swearing that, when they were incarcerated at MCJ in July

2017, MCJ's officers would only "sometimes" (according to Gordon) or "rarely" (according to Piasecki) respond to them pressing their intercom buttons for help, and that when the officers did respond, it was at least sometimes only to tell them to stop pressing the buttons. (ECF No. 32-41, PageID 2259–63; ECF No. 32-42, PageID 2282.)

Next, Plair cites Kyles and Bates-Powell's depositions in this case. She notes that Kyles described the care that he received from MCJ's corrections officers as being "very" "inadequate" and agreed that it was "pretty common for the jail deputies to not adequately respond to requests for medical attention." (ECF No. 32-3, PageID 618, 641.) And she relays that Bates-Powell observed that the officers did not treat (both his and others') requests for medical attention "with very much urgency," characterized the officers as "neglectful," and complained that he "had [one] incident" in which his "arm was cut open" and he "had to have [his] mom call up there to get medical attention." (ECF No. 32-12, PageID 843.)[17]

---

[17] Plair also cites deposition testimony from Steven Paszek swearing that MCJ "deputies ignore" "inmates['] request[s for] medical attention" "quite often." (ECF No. 32-40, PageID 2162–63) (adding that "[m]edical kites are usually answered, but it takes time" while "other kites . . . sometimes you just never get a response"). But Paszek was only incarcerated at MCJ from October 17 through October 19, 2019— after Solomon's death. (ECF No. 32-40, PageID 2136.) Thus, any illegal activity that Paszek observed could not have had any causal link to this case and could not form part of the pattern for which Macomb could be liable here.

The Court finds that these deponent's statements create a genuine dispute of fact as to whether MCJ officers had a clear and persistent pattern of illegally acting with deliberate indifference to the serious medical needs of the people incarcerated under their care. First, the deponents, whose stays in MCJ spanned from 2013 all the way through 2019, indicate that officers routinely ignored medical needs in general. Together, the deponents aver that they not only experienced officers ignoring their own requests for medical attention but also observed officers ignore others' requests for such attention. *Cf. Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010) ("Although Plaintiff did present evidence that several inmates' medical requests were ignored by jail personnel, including Jones's, a jury could not reasonably infer from these five incidents alone that the County had a widespread, permanent, and well-settled custom of ignoring inmate requests.")

Second, the deponents suggest that this routine practice encompassed a pattern of officers deliberately ignoring *serious* medical needs in violation of the Eighth and/or Fourteenth Amendments. *Cf. Farmer*, 511 U.S. at 832–47 (explaining the standard for a deliberate indifference claim under the Eighth Amendment); Section V.A.2.i, *supra* (explaining the standard for a deliberate indifference claim under the Fourteenth Amendment). Indeed, the deponents imply that the officers ignored medical requests indiscriminately, and they never state that the officers adjusted their attention based on the requests' contents. Furthermore, the deponent's allegations of

63

officers ignoring Meyers' severe withdrawal symptoms and Bates-Powell's cut-open arm confirm that the officers' lack of care included an indifference to serious issues.

> ii. Plair has not established a genuine dispute of fact as to whether Macomb had notice or constructive notice of MCJ's officers' pattern of illegally deliberately ignoring incarcerated people's serious medical needs.

On the second element, Plair notes that "[c]ellmates are interviewed after critical incidents and summaries and reports are shared with captains and undersheriffs," and that "[c]aptains and jail administrators attend mortality reviews where witness statements are reviewed and policies are discussed." (ECF No. 32, PageID 576–77) (citing ECF No. 32-5, PageID 692–93). She then argues that "[t]he inmates identified in the pre[vious element] all testified in litigation with Macomb County, defended by its corporation counsel. Thus, Macomb County was aware that inmates often alleged that officers ignored their requests for medical care." (ECF No. 32, PageID 577.)[18]

---

[18] Plair does not make a constructive notice argument. *See generally Hill v. Bradley Cnty. Bd. of Educ.*, No. 05-cv-279, 2007 WL 4124495, at *13 (E.D. Tenn. Nov. 19, 2007) ("Constructive notice will exist where the violation of federal law is *so persistent and systemic* as to be plainly obvious to the relevant policymakers." (emphasis added) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997); *Canton*, 489 U.S. at 390 n.10; *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001); and *Chancellor v. City of Detroit*, 454 F. Supp. 2d 645, 650 (E.D. Mich. 2006)), *aff'd by* 295 F. App'x 740 (6th Cir. 2008).

The Court finds that Plair has failed to create a genuine dispute of fact as to whether Macomb had notice that MCJ's officers had a pattern of deliberately ignoring serious medical needs before Solomon committed suicide. The depositions that Plair relies on from Bates-Powell, Kyles, and Gordon all took place after Solomon's death. (ECF Nos. 32-3, 32-12, 32-41.) Likewise, Piasecki's undated Affidavit was not filed in Court until after then. (ECF No. 32-42.)[19] Therefore, these materials cannot support the proposition that Macomb had actual notice of an illegal pattern in this case. *See Meirs*, 821 F. App'x at 453–54 ("A similar situation *after* the fact, however, does not create a pattern to show that the County was on notice at the time of the event in question.").

That leaves Plair with Macleod and Preziger's Affidavits, which were sworn and filed in 2017. (ECF Nos. 32-43, 32-44); Exhibits to Plaintiff's Response to Defendant Macomb County's Motion to Dismiss Sheriff Anthony M. Wickersham, *Hubble v. County of Macomb*, No. 16-cv-13504 (E.D. Mich. Dec. 14, 2017), ECF Nos. 66-16, 17. Wickersham, Macomb County's Sheriff since 2011, testified that he read these Affidavits at some point in 2018. (ECF No. 32-19, PageID 1217, 1248–49.) But the Affidavits allege only that three officers did not respond to requests for medical care for Meyers in July of 2013. Standing alone, these allegations are not

---

[19] At the Hearing, Plair's counsel stated that Piasecki's Affidavit was filed before Solomon's death, but the Affidavit provided to the Court shows that it was filed on January 21, 2021. *See* ECF No. 32-42.

enough to establish any *persistent pattern* of officers ignoring incarcerated people's serious medical needs, much less a pattern that extended into 2018 and 2019, when Solomon was detained at MCJ.

Accordingly, the Court **GRANTS** Macomb summary judgment on Plair's Custom of Inaction claim.

## VI. CONCLUSION

For the reasons listed above, the Court:

1) **GRANTS** Rickert's Motion for Summary Judgment on Plair's Eighth Amendment claim;

2) **DENIES** Rickert's Motion for Summary Judgment on Plair's Fourteenth Amendment claim;

3) **GRANTS** Rickert's Motion for Summary Judgment on Plair's negligence claim; and

4) **GRANTS** Macomb County's Motion for Summary Judgment on Plair's Affirmative Policy, Failure to Train, and Custom of Inaction claims.

Plair's only remaining claim is that Rickert violated Solomon's Fourteenth Amendment right to be free from deliberate indifference to his serious medical needs (Count II of her First Amended Complaint).

**IT IS SO ORDERED.**

Dated: August 2, 2023

s/Paul D. Borman
Paul D. Borman
United States District Judge